**STATE of Missouri, Respondent,**

v.

**D.W.N., Appellant.**

**No. WD 69142.**

Missouri Court of Appeals, Western District.

Aug. 11, 2009.

Jeremiah W. (Jay) Nixon, Attorney General, Evan J. Buchheim, Assistant Attorney General, Jefferson City, MO, for Respondent.

Craig A. Johnston, Assistant State Public Defender, Columbia, MO, for Appellant.

Before THOMAS H. NEWTON, Chief Judge, and HAROLD L. LOWENSTEIN, JAMES M. SMART, JR., JOSEPH M. ELLIS, VICTOR C. HOWARD, LISA WHITE HARDWICK, JAMES E. WELSH, ALOK AHUJA, and MARK D. PFEIFFER, Judges.

MARK D. PFEIFFER, Judge.

D.W.N. appeals the trial court's judgment of his conviction for the class B felony of child molestation in the first degree in violation of § 566.067, RSMo Cum. Supp.2006. On appeal, he presents two points in which he challenges: (1) the trial court's failure to *sua sponte* prohibit a witness from testifying that he believed the victim; and (2) the trial court's submission of Instruction No. 5, the State's verdict director. We affirm.

In 2001, when the victim was five years old, her mother married D.W.N. in Georgia. In 2003, D.W.N. and the victim moved to Chillicothe, Missouri, to stay with her mother's parents. Her mother planned on joining them after she was discharged from the military. At her grandparents' house, the victim slept on a pull-out bed while D.W.N. slept on a couch in the same room.

One night, in March 2003, the victim was unable to sleep, so D.W.N. told her to get into bed with him. She complied and lay on the couch with him. D.W.N. reached into her underwear and touched her breasts and genital area. At this point, someone turned on a light in the house, so D.W.N. told the victim to go back to her own bed. The victim did not report the incident.

In February 2005, the victim's mother and D.W.N. separated. A few weeks later, the victim told her mother that D.W.N. had abused her sexually. The victim told her that the abuse occurred elsewhere and did not occur in Missouri. During the subsequent investigation, the victim told her mother about the incident that occurred in Chillicothe. During this investigation, Tommy Capps, a criminal investigator with the State, also interviewed the victim.

The police arrested D.W.N., and the State charged him with one count of the class B felony of child molestation in the first degree in violation of § 566.067. At trial, the State called Tommy Capps, who testified that he interviewed the victim and believed that she was credible. D.W.N.'s counsel did not object to this testimony. At the close of the evidence, the trial court submitted Instruction No. 5, the State's verdict director, to the jury. The verdict director informed the jury that D.W.N. was guilty of child molestation if he touched either the victim's genitals *or* her breast. The jury returned a verdict in which it found D.W.N. guilty of the crime. The trial court entered judgment on the jury's verdict and sentenced D.W.N. to ten years in the Missouri Department of Corrections. This appeal follows.

In his first point on appeal, D.W.N. claims that the trial court plainly erred in failing to *sua sponte* strike the testimony of Tommy Capps wherein he testified that he found the victim credible. D.W.N.'s argument of plain error is that this testimony invaded the province of the jury. Specifically, D.W.N. claims that Capps' testimony invaded the province of the jury because the jury has the sole responsibility to make credibility determinations. D.W.N. concedes that he did not object to Capps' testimony and requests plain error review pursuant to Rule 30.20.[1]

■■■ Rule 30.20 grants us authority to consider "plain errors affecting substantial rights ... when [we find] that manifest injustice or miscarriage of justice has resulted" from the error. Under plain error review, we first examine the record to determine whether or not the appellant's

claim is one that, on its face, establishes grounds for believing that a manifest injustice has occurred. *State v. Norman*, 178 S.W.3d 556, 560 (Mo.App. W.D.2005). If our review of the record determines that plain error is facially established and such error establishes substantial grounds for believing that manifest injustice has occurred, only then do we review the record to determine whether or not a manifest injustice or a miscarriage of justice actually occurred. *Id.* Conversely, in the absence of such a determination, appellate courts should decline to exercise discretion to review for plain error under Rule 30.20. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). "The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review." *State v. Houston*, 139 S.W.3d 223, 227 (Mo.App. W.D.2004). " 'Plain error is evident, obvious, and clear error.' " *Norman*, 178 S.W.3d at 560 (*quoting State v. Bailey*, 839 S.W.2d 657, 661 (Mo.App. W.D.1992)).

■■■ In child molestation cases, there are typically two types of expert testimony: generalized and particularized. *State v. Churchill*, 98 S.W.3d 536, 539 (Mo. banc 2003). An expert gives generalized testimony when he describes the general behaviors and characteristics commonly found in children who have been abused. *Id.* This type of evidence is admissible. *Id.* On the other hand, an expert gives particularized testimony when he gives testimony regarding the specific victim's credibility. *Id.* This type of evidence is inadmissible because it usurps the jury's province to determine the credibility of witnesses. *Id.*

indicated.

In this case, the State called Tommy Capps, a criminal investigator for the State Technical Assistance Team, who testified that he interviewed the victim and found her credible:

Q. Now, you said you've done over 500 interviews. For more than nine years you've been working with children. Do you think you're a pretty good judge of when children are telling the truth and when they're lying?

A. Yes, I think I'm a pretty good judge of it, because not only do you have to pay attention to what they're telling you but you have to pay attention to body language.

Q. Okay. And what sort of body language do you look for when a child is lying?

A. It depends on the child, but most generally they have a hard time looking at you when they're lying, or they'll look down, generally to the—generally to the left if they're going to be lying to you. They'll put their hands up in front of their face. They'll look away. Sometimes they just get real white. There's—there's just about as many different signs for that as there is kids.

Q. You say you're pretty good at picking up those signs?

A. I'm pretty good at picking up those signs.

Q. Did you pick up any of those signs of lying with [the victim]?

A. No.

. . . .

Q. . . . [I]n this matter, do you think [the victim] was telling the truth?

A. Yes.[2]

Finally, during redirect examination, Capps again testified that he believed the victim:

Q. Okay. And you've had—you've experienced children who are lying?

A. Yes.

Q. And you've experienced children who are coached?

A. I have.

Q. Did you find [the victim] to be either one of those things?

A. No.

 Capps' testimony that he believed that the victim was telling the truth about

---

**2.** On appeal, the parties agree that Capps interviewed the victim twice. The parties also agree that during the first interview, she denied that D.W.N. performed sexual acts with her in Missouri, but, during the second interview, revealed that D.W.N. had done so in Missouri. A review of the trial record, however, establishes that Capps never actually testified to the victim's description of sexual abuse to him during his second interview as being allegations of abuse attributable to abuse that occurred in Missouri. While the impetus for the second interview was due to the victim's mother contacting Capps to advise him of new allegations of abuse in Missouri, the location of the sexual abuse never comes up in trial testimony by Capps when he describes the victim's statements to him in his second interview with the victim. This is particularly important in light of defense counsel's statement to the jury in her opening statement that the victim had told another forensic interviewer, Julie Donnell, that "it happened in South Carolina, it happened in Georgia, but nothing happened in Missouri." Thus, while Capps explicitly states that he believes the victim's statement, he never actually states which of her statements (or both) he believes, and as far as the criminal venue issue is concerned, there is nothing inconsistent in Capps' description of the victim's statements to him in the two interviews that he conducted. Given this testimony, it is difficult to ascertain how this constitutes the sort of alleged prejudice that rises to the level of "manifest injustice," the burden required of appellant in the present appeal.

the perpetration of a crime was, if properly objected to, inadmissible because it invaded the jury's province to determine the victim's credibility. *State v. Churchill,* 98 S.W.3d at 539. If D.W.N.'s counsel would have objected to the testimony, the trial court would have been obligated to entertain curative relief proposed by D.W.N.'s counsel. D.W.N.'s counsel, however, did not object to the testimony. Thus, the issue is whether or not this was such an evident, obvious, and clear error that the trial court should have *sua sponte* interrupted Capps' testimony to prohibit him from testifying that he believed the victim. Historically, Missouri courts reject invitations to criticize trial courts for declining to *sua sponte* take action on behalf of a party during witness examinations. *State v. Roper,* 136 S.W.3d 891, 902 (Mo.App. W.D.2004) ("Uninvited interference by the trial judge in trial proceedings is generally discouraged, as it risks injecting the judge into the role of participant and invites trial error."); *State v. Drewel,* 835 S.W.2d 494, 498 (Mo.App. E.D.1992) ("We do not expect trial judges to assist counsel in the trial of a lawsuit.... They preside to judge a lawsuit. *Sua sponte* action should be exercised only in exceptional circumstances.").

In support of his argument that the trial court should have *sua sponte* interrupted Capps' testimony, D.W.N. points to *State v. Williams,* 858 S.W.2d 796 (Mo.App. E.D.1993). D.W.N. is correct that, in *Williams,* the appellate court did determine that the circuit court plainly erred in failing to *sua sponte* interrupt a medical doctor's testimony that he found the victim credible:

> The [witness's] statements that 'very rarely do children [sexually abused children] lie,' that the '[i]ncidents of lying

among children is very low, less than three percent,' that if the child was not asked leading questions, then the child's spontaneous response 'declares who it was [who sexually abused her],' and that the 'physical findings and the behavioral indicators can only support what the child says,' went beyond admissible testimony concerning general, behavioral characteristics of sexually abused children. Vouching too much for the victim's credibility, these statements supplied improper verisimilitude on the issue of whether the appellant was guilty....

> ... The danger was too great that the jury accepted the doctor's testimony as conclusive of appellant's guilt without making an independent determination of the victim's credibility. The doctor's statements amounted to an impressively qualified stamp of truthfulness on the victim's story, and a miscarriage of justice will result from a refusal to reverse for plain error.

*Williams,* 858 S.W.2d at 801.

The *Williams* court, however, did not create a *per se* rule that the trial court commits plain error anytime it fails to *sua sponte* prohibit any witness from vouching for the victim's credibility. And, in fact, the *Williams* court admitted that "[a] determination of whether plain error exists must be based on the consideration of the facts and circumstances of each case." *Id.* at 798.

Based on the *Williams* court's concession that this determination must be done on an individual basis, other courts have considered the issue and determined that the trial court did not plainly err in failing to *sua sponte* prohibit a witness from vouching for the victim's credibility. *See*

*State v. Collins,* 163 S.W.3d 614, 621 (Mo. App. S.D.2005); *State v. Hamilton,* 892 S.W.2d 774, 781 (Mo.App. S.D.1995). These courts have distinguished their cases from *Williams* on the basis that it was apparent from the records that the respective defense attorneys did not object to the testimony of the witnesses, or withdrew objections, for strategic reasons. *Collins,* 163 S.W.3d at 623 ("Because Defendant used [the child advocacy interviewer's] at-trial 'idiosyncratic detail' comments to support his defense strategy, we will not convict the trial judge of error, plain or otherwise, for not *sua sponte* excluding such testimony."); *Hamilton,* 892 S.W.2d at 781 ("We find no case, and Appellant cites none, where an appellate court convicted a trial court of plain error in failing to exclude evidence after an accused withdrew his objection to it."). These courts concluded that a trial court cannot be guilty of plain error for failing to prohibit testimony when the record shows that the defendant's counsel strategically allowed the evidence to come in. *Id.* Thus, the issue becomes whether our record reflects a clear indication that D.W.N.'s counsel chose not to object to Capps' testimony for strategic reasons.

In addressing the topic of trial strategy, we are mindful of the fact that jury trials do not occur in a vacuum. A trial counsel's choice to object or not to object to the presentation of evidence must be analyzed in the context of the entire trial record, not bits and pieces of it. If an appellate court is going to convict a trial judge of failing to

*sua sponte* take measures to usurp the role of trial counsel and voice its objection to the introduction of evidence that trial counsel may very well *want* in evidence for the purpose of exploiting such evidence, we must be firmly convinced that any other result would constitute a miscarriage of justice. To be clear, though, our country's system of justice does not discourage jurors from exercising common sense and drawing upon their life's experiences in fulfilling their role in a jury trial. In exercising their role as trial advocates in a trial by jury, our country's system of justice does not discourage trial counsel from developing reasonable trial themes and strategies that are often based upon their own successes and failures in the trenches of previous courtroom battles. Finally, in fulfilling the role of an impartial gatekeeper of evidence in a trial by jury, our country's system of justice does not discourage trial judges from relying upon their history and experience with the lawyers before them and their history and experience with prior jury trials in attempting to discern which trial themes and strategies are worthy of evidentiary latitude.

The reason the standard for plain error review is such a stringent appellate standard is that, in those rare circumstances that justify Rule 30.20 relief, we have no choice but to bleed the lines between the roles of judges, juries, and trial counsel, thereby disturbing the natural order of our country's system of justice.[3] In so disturbing the design of our country's system

3. For example, if we were to entertain one of the suggestions of appellant's counsel that the claimed trial error was so egregious that it deserved an immediate *sua sponte* declaration of mistrial by the trial judge, such a scenario may have had the practical effect of transforming the trial judge into judge, jury, and trial advocate in one fell swoop. For, if the trial court had taken such a course of action and declared a mistrial, that action might very well have had double jeopardy implications since prosecutorial conduct would have allegedly resulted in the *sua sponte* mistrial, such that the defense would argue that the underlying criminal charge and any subse-

of justice, we must determine whether the plain error complained of is evident, obvious, and clear and, if it is, whether manifest injustice has actually occurred. *Norman*, 178 S.W.3d at 560.

The entirety of the trial record in this case reflects a clear defense theme: if any crime was committed by the defendant, ***it did not happen in the State of Missouri!*** Of course, if no crime was actually committed in the county and state that so charged the defendant, no lawful conviction can occur within said county and state. This trial theme of *where* abuse occurred versus *whether* abuse occurred is central to a reasoned analysis of whether D.W.N. can establish plain error in this case.

In the pre-trial conference, defense counsel presented an oral motion *in limine* regarding evidence relating to a forensic interview conducted by criminal investigator, Julie Donnell. In that pre-trial conference, defense counsel argued that the defense should be able to present the evidence of Donnell's forensic interview in which the victim, on three occasions within that interview, denied that any sexual abuse by the defendant occurred in Missouri. The motion related to a requested ruling of the trial court that the prosecution should not be permitted to describe the entirety of that videotaped interview in which the victim describes the details of sexual abuse perpetrated upon her by the defendant in the states of South Carolina and Georgia. The motion was denied, and essentially, the trial court stated that if the defense wanted to use "the good evidence" from that interview, the defense would open the door to the entire context and substance of the Donnell interview, includ-

ing the fact that the victim had detailed acts of abuse in South Carolina and Georgia. So, defense counsel was then presented with what was probably an anticipated trial strategy dilemma. In short, witnesses included two criminal investigators and a police officer: (1) Julie Donnell; (2) Tommy Capps; and (3) Officer Tony Kirkendoll of the Chillicothe, Missouri, police department. To *both* of the criminal investigators, the victim had clearly and unequivocally made statements to each of them that the defendant sexually abused her, but *not in Missouri.* And, defense counsel also knew that she had a reasonably high probability of prevailing on an objection to the testimony of the police officer. With this background, defense counsel gave the following opening statement to the jury, in pertinent part:

> 'Nothing happened in Missouri.' That is what [the victim] told Julie Donnell of the child protection services in April of 2005.... Julie rephrased that, 'So you're telling me that it happened in South Carolina, it happened in Georgia, but nothing happened in Missouri?' And [the victim] said, 'Yes.' Later, Julie said, 'What about when you were living in Carrollton?' And [the victim] very clearly said, 'Carrollton is in Missouri, and nothing happened in Missouri.'
>
> A few weeks later, May 13th of 2005, Tommy Capps went to [the victim's] house.... Tommy pulled [the victim] aside and said, 'Are you sure nothing happened in Missouri?' And she said, 'Yes, I'm sure. Nothing happened in Missouri.'
>
> ... At the close of all the evidence ... I'm going to talk to you again and I'm

quent prosecution would necessarily have to be dismissed (since the defendant would not

have been the one requesting the mistrial).

going to ask you to believe [the victim]. I'm going to ask that you believe her first statement, her second statement, her third statement, and her fourth statement, and the statement she continued to say for ten months, and I would ask that you find [the defendant] not guilty.

In the State's case in chief, the victim's mother testified first and provided evidentiary details regarding the background of her approximately four-year relationship with the defendant and his participation in the family unit that included the victim, her daughter from a previous relationship. The victim's mother testified to statements of abuse that her daughter made to her after the mother was separated from the defendant, but the details of the sexual abuse of the victim were adduced via direct testimony by the victim. The trial record reflects that the victim, then twelve years old, withstood a difficult examination and cross-examination. She was testifying about horribly sensitive matters that happened when she was approximately seven years old, and she testified to every element of the crimes that the defendant was charged with. She admitted matters that she had to and had plausible explanations for inconsistencies. For example, the victim freely admitted that she had first told Julie Donnell and Tommy Capps that no abuse occurred in the State of Missouri. The victim's testimony included some of the background of her interview with Julie Donnell in which the victim detailed acts of abuse to Donnell that occurred in South Carolina and Georgia, but staunchly denied to Donnell that anything inappropriate happened in Missouri. She also admitted that she first told Tommy Capps that she was certain nothing happened in Missouri. Her explanation for her denials of abuse in Missouri to Donnell and Capps was, in part, based upon the fact that she testified that she was scared for several reasons at the time of those interviews: (1) since the abuse in Missouri occurred at the home of her grandparents, she was afraid that her grandparents would somehow be in trouble if she told investigators of abuse that occurred at their home in Chillicothe, Missouri; and (2) the defendant had threatened to kill her. She provided credible testimony in support of the State's case in chief. She certainly provided testimony that was sufficient, in and of itself, to support the jury's verdict.

Next, investigator Tommy Capps testified. The trial record demonstrates that D.W.N.'s counsel was cognizant of the subject matter of Capps' intended trial testimony. For example, the record shows that, during Capps' direct examination, D.W.N.'s counsel objected to Capps' testimony on an unrelated matter and, during cross-examination, subjected him to a vigorous examination. During cross-examination, D.W.N.'s counsel examined Capps on his assertion that he was a good judge of credibility:

Q. And you also testified that you're pretty good at telling whether a child lies or not.

A. Yes. I'm pretty good at determining whether a child is lying to me or not.

. . . .

Q. So it is possible that if a child says everything happened and never changes her story, that child could be telling the truth; is that correct?

A. That's correct.

Q. And if a child says, 'This is what happened,' and later recants, that child may or may not be telling the truth; is that correct?

A. That's correct.

Q. And if a child says, 'This happened,' and then later adds to the story, that child could be lying, as well?

A. As long as you recognize the part that it's adding—the child is adding to the story and not changing the story for a particular—for a particular reason.

Q. So if a child changes a story, then that would be an indication to you that the child is lying.

A. No.

Q. Would that be an indication the child is telling the truth?

A. That would be an indication to me that that child may be remembering a different event or a different portion of the same event and is—and is recounting that to me—giving that to me at the time.

D.W.N's counsel used this testimony to argue in her closing argument that Capps was a self-contradictory witness:

And, quite frankly, I hate to use the word 'voodoo science,' but you heard me questioning him. And he says, 'You know, it's not uncommon.' That's the phrase they always use: 'It's not uncommon.' Anything that you need to explain, they always say, 'It's not uncommon.' When I tried to pin him down, 'Is there a bright-line rule? I mean, does— does every child always disclose late? Does every child disclose this'—'Well, no.' I said, 'If—if they disclose everything all upfront, are they lying?

'Well, no.'

He said that it was uncommon for that to happen, but no. When I tried to ask him all those questions about, well, does that mean the child is lying, does that mean the child is lying, never said. So, basically, whether you disclose early, you disclose late, you disclose partial, apparently even if you recant, that does not prove that you are lying. It also does not prove that you're telling the truth either.

Mindful of the trial theme, counsel also highlighted to the jury in closing argument that the victim had *originally* told Capps that no abuse occurred in Missouri,[4] and D.W.N.'s counsel also artfully argued that the victim's recollection of any alleged sexual abuse in Missouri would have occurred closer in time and, thus, fresher in her mind than any alleged abuse in another state (at the time of the victim's initial denial of abuse in Missouri to Capps).

Investigator Julie Donnell was unavailable for trial; but as stated previously, defense counsel cross-examined the victim with reference to her multiple denials to Donnell that any abuse ever happened in the State of Missouri.

And, while defense counsel did not object to Investigator Capps commenting about the credibility of the victim, the record also demonstrates that counsel was aware of the well-established rule that a witness cannot vouch for the credibility of the victim. During the examination of the next witness, Lt. Tony Kirkendoll of the Chillicothe Police Department, which occurred *immediately* after Capps' testimony *without a trial recess,* defense counsel made the following objection:

---

**4.** Capps testified that he first met the victim on May 23, 2005, and in reference to his conversation with the victim on that date, Capps stated at trial: "I asked her if she was sure that nothing had happened in Missouri, and she told me that nothing had happened in Missouri." Presumably, defense counsel did not oppose testimony from Capps that the victim was "credible" when she made this statement to Capps.

Q. Okay. And you, again, were present when [the victim] was giving a forensic interview to Tommy Capps?

A. Yes, I was.

Q. Okay. Do you believe she was being truthful?

Ms. Dunn: Your Honor, I'm going to object to this question. I don't believe there has been a proper foundation laid for this witness to be an expert as to whether a child is telling the truth or not. I think it's invading the province of the jury. It is for the jury to decide for themselves whether [the victim] was telling the truth, and I don't believe that Officer Kirkendoll can assist in that.

Ms. Gibson: Your Honor, I'll withdraw the question.

Interestingly, the "expert foundation" objection was not the appropriate objection. Instead, the "invading the province of the jury" objection was the relevant objection. The jury, however, did not know that. All they knew was that, in the State's case in chief, the State called a uniformed police officer with, literally, a badge of authority; that the first words out of defense counsel's mouth in front of the jury were that this police officer has no "expertise" to assist in this case and, shortly thereafter, the police officer is excused, having given virtually no substantive testimony. So, was it a mistake on defense counsel's part to lead with an objection to the police officer's testimony on the grounds that he has no expertise, or was it a planned strategy to object in that fashion so the jury would hear that objection? The totality of the trial record indicates that the articulation of this objection was part of trial counsel's overall trial strategy.

In any event, from this record, it is clear that D.W.N.'s trial counsel was aware of both the governing law and the ramifications of Capps' testimony versus the weight and deference that may have been given to the police officer's testimony on the issue of the victim's credibility. From this record, the trial court had before it clear indications that D.W.N.'s counsel had a strategic reason for objecting to the police officer's (Lt. Kirkendoll) testimony while choosing not to object to Capps' improper vouching for the victim's credibility. If this is true then, pursuant to *Collins* and *Hamilton*, the trial court could not have plainly erred in failing to *sua sponte* prohibit Capps' testimony. *Collins*, 163 S.W.3d at 621–23; *Hamilton*, 892 S.W.2d at 781. Conversely, counsel's objection to Lt. Kirkendoll's testimony occurred after Capps' testimony. Thus, it is *theoretically possible* or *conceivable* that, although she was cognizant of Capps' testimony, counsel did not realize, at the time Capps testified, that his victim credibility testimony was impermissible.[5] If this is

5. A review of the record, however, shows that D.W.N.'s counsel did not include this claim in her motion for new trial. It would be reasonable to assume that if counsel concluded after the trial (or after Capps' testimony and before Kirkendoll's testimony) that Capps' testimony was inadmissible and it was plain error for the trial court to permit the introduction of such evidence even without objection, she would have included the claim in her motion for new trial. The absence of this claim in her motion for new trial supports the conclusion that counsel chose not to object for strategic reasons. Further, it is clear that defense counsel *needed* Capps' testimony that Capps *believed* the victim was *credible* when she first told Capps that the abuse did not occur in Missouri. If this case revolved around a legitimate defense as to *whether* abuse occurred, instead of *where* it occurred, the circumstances might have warranted a different result. But, with venue as the cornerstone defense, counsel needed to exploit, not object to, the testimony of Capps, and it is this

true (albeit a theoretical stretch of logic), then pursuant to *Williams,* D.W.N. would have a stronger argument that the circuit court plainly erred in failing to *sua sponte* prohibit Capps from testifying that he found the victim credible. *Williams,* 858 S.W.2d at 800–01. Thus, the only issue for us to decide is whether or not a circuit court can be guilty of plain error for failing to *sua sponte* prohibit the admission of testimony when the totality of the circumstances reflect a clear indication that counsel strategically chose not to object to the introduction of the testimony.

■ A trial court does not plainly err when it fails to *sua sponte* prohibit the introduction of objectionable evidence when the totality of the surrounding circumstances reflect a clear indication that trial counsel strategically chose not to object to the evidence. To hold otherwise would put the circuit court in a no-win situation:

> If the trial court received the evidence [and allowed a witness to testify that he or she found the victim credible], the accused could ... claim receipt of the evidence was plain error, requiring reversal. If the trial court [*sua sponte*] excluded the evidence, the accused could contend on appeal that the trial court improperly interfered by barring evidence which the accused consciously chose to allow the jury to hear, thereby requiring reversal. To state the scenario is to expose its potential for mischief.

*Hamilton,* 892 S.W.2d at 781; *see also State v. Valentine,* 584 S.W.2d 92, 97 (Mo. banc 1979) (overruled on other grounds by *Sours v. State,* 593 S.W.2d 208, 210 (Mo. banc 1980)) ("Since counsel chose not to object but instead to exploit the alleged backdrop that the trial court had before it at

deficiencies at trial, appellant may not now be heard to complain of a chosen trial strategy. If it were otherwise the accused could trap the trial court with 'error' of the accused's own making or in which he joined or acquiesced.")

■ Applied to the present case, defense counsel had a client who chose to assert his right not to testify and a victim that provided compelling testimony of the crimes. So, the clear indication from the trial record reflects that defense counsel made a conscious choice to defend the case on the grounds that while the defendant may have committed crimes, no criminal acts occurred in the State of Missouri. D.W.N.'s counsel accepted the trial court's ruling on her motion *in limine* and focused her closing argument on four statements of denial to two different criminal investigators. In closing, defense counsel argued, in pertinent part:

> 'Nothing happened in Missouri.' That is what [the victim] said not once, not twice, not three times, but four times she said, 'Nothing happened in Missouri.'
>
> ... Do you like [D.W.N.] right now? Do you think something happened in another state? You are required to put that out of your mind. That is for another state to decide. That is for another jury to decide at a later date....
>
> ... You saw [the victim] today. She's a young lady. She's fairly bright, and she's fairly articulate. She was just as clear in 2005 when she talked to [Julie Donnell], and when she talked to Tommy Capps she was just as clear, that nothing happened in Missouri. What do you do when somebody has told you two different stories of the same event? I

the time of Capps' testimony.

would submit to you that that is reasonable doubt. You have no way of knowing which one is true. That is reasonable doubt, and that means ... you must do your duty and find [D.W.N.] not guilty.

When one considers the entirety of the evidence of this case, something this court gets to do with a transcript and months of deliberation while a trial court has it happening before its eyes and has seconds to consider the consequences of objections or the lack thereof, it can hardly be said that the trial court unreasonably declined to take action on its own motion on behalf of the defense when the clear indication of the actions of D.W.N.'s trial counsel reflected a conscious and deliberate choice not to object to Capps' testimony. Accordingly, we find no error, plain or otherwise, with the decision of the trial court to refuse to interject itself *sua sponte* into the advocacy of one of the parties to this case below and, instead, conclude that the trial judge exercised appropriate evidentiary discretion and appropriate judicial restraint.

So that there is no confusion, our ruling today is not intended to suggest that if a trial court can conceive of a theoretical possibility for some sort of trial strategy, the trial court should decline to *sua sponte* intervene in witness examination. Instead, when the totality of the circumstances before the trial court reflect a clear indication that counsel's actions in choosing not to object to otherwise objectionable testimony is guided by strategic considerations, the trial court should exercise judicial restraint with regard to *sua sponte* intervention. Our ruling today follows a long line of case precedent previously cited above. Under the totality of circumstances of this case, there is no plain error. There is no manifest injustice.

The defendant, of course, is not without an additional remedy because he can still file a Rule 29.15 motion in which he can request an evidentiary hearing for the purpose of demonstrating that his counsel provided him with ineffective assistance of counsel when she chose not to object to the admission of evidence. Rule 29.15(a). In that regard, Rule 29.15 provides a thorough procedure to determine if a trial counsel's actions at trial were a part of his or her trial strategy and whether trial counsel's conduct fell below the constitutional standards of assistance of counsel. *See generally* Rule 29.15; *Butler v. State*, 108 S.W.3d 18, 25 (Mo.App. W.D.2003).

Additionally, our ruling today does not disadvantage the defendant because the results of a successful Rule 29.15 motion and of a successful appeal pursuant to Rule 30.20 are the same: the court vacates the judgment of his conviction and remands his case for a new trial. *See Butler*, 108 S.W.3d at 28 (judgment reversed pursuant to Rule 29.15 and case remanded for new trial); *Williams*, 858 S.W.2d at 802 (judgment reversed pursuant to Rule 30.20 and case set for new trial). This rule, however, has the advantage of keeping the trial court out of evidentiary matters that reasonably could be a matter of trial counsel strategy while still affording the defendant an opportunity to show that his counsel should have objected to the evidence and that any such strategy to the contrary was simply unreasonable.

We take no position today on, whether or not, if D.W.N.'s trial counsel did have a strategic reason for choosing not to object, that strategy was reasonable. D.W.N., of course, is free to file a Rule 29.15 motion in order to determine whether or not his counsel had a reasonable strategy for choosing not to object to Capps' testimony.

Based upon the foregoing, we conclude that D.W.N.'s first point on appeal is without merit.

In his second point on appeal, D.W.N. claims that the trial court erred in submitting Instruction No. 5, the State's verdict director, because the instruction's language, which stated that D.W.N. was guilty of the offense if the jury found that he "touched the genitals *or* breast of [the victim]" violated his right to a unanimous jury verdict.[6] Specifically, D.W.N. claims that the instruction's language violated his right to a unanimous jury verdict because it did not require the jurors to be unanimous on his guilty conduct.

 Pursuant to Rule 28.02(c) "[w]henever there is an MAI–CR instruction or verdict form applicable under the law and Notes on Use, the MAI–CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form." "The giving or failure to give an instruction or verdict form in violation of this Rule 28.02 or any applicable Notes on Use shall constitute error, the error's prejudicial effect to be judicially determined . . . ." Rule 28.02(f). D.W.N., however, concedes that he did not preserve his claim of instructional error and requests plain error review pursuant to Rule 30.20.

Instructional error seldom rises to the level of plain error. To show that the trial court plainly erred in submitting a jury instruction, a defendant must go beyond a demonstration of mere prejudice. In the context of instructional error, plain error results when the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict, and cause[d] manifest injustice or miscarriage of justice. The defendant bears the burden of showing that plain error has occurred which resulted in manifest injustice or a miscarriage of justice.

*State v. Beck,* 167 S.W.3d 767, 778–79 (Mo. App. W.D.2005) (citation omitted). Hence, to succeed on his claim of instructional error, D.W.N. has the burden of not only proving that Instruction No. 5 clearly and obviously failed to properly instruct the jury but also that the error so affected the verdict that it caused him manifest injustice or a miscarriage of justice.

In this case, the trial court submitted Instruction No. 5 to the jury. Instruction No. 5, the State's verdict director, stated that:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about March of 2003, in Livingston County, State of Missouri, the defendant touched the genitals *or* breast of [the victim], and

Second, that he did so for the purpose of gratifying his own sexual desire, and

Third, that [the victim] was then less than fourteen years old,

then you will find the defendant guilty of child molestation in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

(Emphasis added.) D.W.N. is correct that this instruction's use of the disjunctive was improper.

 The Missouri Constitution provides "[t]hat the right of trial by jury as

---

6. We added the emphasis.

heretofore enjoyed shall remain inviolate[.]" Mo. Const. art. I, § 22(a). This right to trial by jury includes "all the substantial incidents and consequences that pertain to the right to jury trial at common law." *State v. Hadley*, 815 S.W.2d 422, 425 (Mo. banc 1991). This includes the right to have the jury's unanimous concurrence in the verdict. *Id.*

Prior cases have held that the disjunctive submission of an element of an offense in a single instruction runs afoul of a defendant's constitutional right to a unanimous concurrence in the verdict. *See State v. Baker*, 103 S.W.3d 711, 723 (Mo. banc 2003); *State v. Oswald*, 306 S.W.2d 559, 563 (Mo.1957); *State v. Wilkins*, 872 S.W.2d 142, 146 (Mo.App. S.D.1994); *State v. Mackey*, 822 S.W.2d 933, 936 (Mo.App. E.D.1991). This is because an instruction that submits a proof element in the disjunctive creates a situation where some of the jurors may have agreed that he was guilty of the offense because he committed one act while the other jurors believed that he was guilty because he committed another act. *Oswald*, 306 S.W.2d at 563.

■ The instruction given in this case, Instruction No. 5, illustrates the problem with instructions that submit proof elements in the disjunctive. By listing genitals and breast in the disjunctive, Instruction No. 5 created a scenario where, in theory, some of the jurors could have found D.W.N. guilty of the offense because he touched the victim's genitals while the rest of the jurors could have found him guilty because they believed he touched her breast. This violated D.W.N.'s right to a unanimous jury. *See Baker*, 103 S.W.3d at 723 (State concedes that instruction that listed the items that he possessed in the disjunctive was error); *Oswald*, 306 S.W.2d at 563 (trial court erred in submitting instruction that stated that the defendant was guilty if he inserted his genitals in victim's mouth *or* victim's rectum); *Wilkins*, 872 S.W.2d at 146 (instruction that stated defendant was guilty if he touched her genitals *or* breasts violated defendant's right to unanimous verdict); *Mackey*, 822 S.W.2d at 936 (error to submit instruction that stated defendant was guilty if he placed his mouth *or* hand on victim's genitals). It is, therefore, clear from the record that the trial court failed to properly instruct the jury. Since our facial review of the record shows that the trial court committed plain error in submitting Instruction No. 5, we must then review the record to determine whether or not a manifest injustice or a miscarriage of justice actually occurred. *Norman*, 178 S.W.3d at 560.

■ In claiming that he suffered a manifest injustice, D.W.N. does not point to anything in the record to show that Instruction No. 5 affected the jury's verdict. Rather, he claims that the court should consider this type of error to be a structural error that requires automatic reversal without the need for the defendant to show that he was actually affected by the error. D.W.N. argues that in *State v. Goucher*, 111 S.W.3d 915, 920 (Mo.App. S.D.2003), the court held that a trial court's plain error in failing to submit an instruction based on MAI–CR3d 302.05, which would have informed the jury that its decision had to be unanimous, was a structural error that required automatic reversal. D.W.N. concedes that the trial court did give an instruction based on MAI–CR3d 302.05, but maintains that, since his claim touches upon the same issue of a defendant's right to a unanimous verdict, the same automatic reversal standard should apply.

■ In making this argument, however, D.W.N. ignores the fact that the Missouri Supreme Court has already concluded that this type of error is not a structural error and is, instead, an error that the court must subject to a manifest injustice inquiry. *See Baker,* 103 S.W.3d at 723. We are bound to follow the latest Missouri Supreme Court precedent. *State v. Aaron,* 218 S.W.3d 501, 511 (Mo. App. W.D.2007). Thus, D.W.N.'s argument that we should apply a structural error standard to his case is without merit.

■ In that regard, the courts have concluded that trial court error in submitting an instruction in the disjunctive does not result in manifest injustice when: (1) the record contained sufficient evidence to find that the defendant committed both acts; and (2) the alleged acts took place in close proximity to each other. *Mackey,* 822 S.W.2d at 936; *see also Baker,* 103 S.W.3d at 723. In his brief, D.W.N. does not explain how, under this test, Instruction No. 5 resulted in a manifest injustice, and given the record, we cannot see how it could have resulted in a manifest injustice.

At trial, the State presented evidence that D.W.N. told the victim to get in bed with him. After she did, D.W.N. touched her genitals and breasts. Thus, the only evidence of sexual misconduct prosecuted by the State at trial, which was alleged to have occurred in Livingston County on or about March 2003, occurred during the same event. In support thereof, the State relied on the victim's testimony in which she testified that, after she got in bed with D.W.N., he touched her genitals and breasts during one event in March 2003. Because the complained-of deviate acts of sexual misconduct occurred in one event, we conclude that D.W.N. has failed to demonstrate that the trial court so misdirected the jury that the instructional error affected the jury's verdict and caused manifest injustice. *See, e.g., Wilkins,* 872 S.W.2d at 147 (the defendant could not prove manifest injustice because the two actions occurred simultaneously as one event); *Mackey,* 822 S.W.2d at 936 (because the alleged acts of sexual abuse took place on one day, the defendant did not suffer any manifest injustice from the submission of an instruction in the disjunctive). Consequently, D.W.N.'s second point on appeal is without merit.

We affirm the judgment of the trial court.

HAROLD L. LOWENSTEIN, JAMES M. SMART, VICTOR C. HOWARD, and JAMES E. WELSH, Judges, concur in majority opinion.

ALOK AHUJA, Judge, dissents in separate dissenting opinion. THOMAS H. NEWTON, Chief Judge, and JOSEPH M. ELLIS and LISA WHITE HARDWICK, Judges, concur in dissenting opinion.

ALOK AHUJA, Judge, dissenting opinion.

In this case the prosecution explicitly—and repeatedly—asked one of its witnesses for his opinion as to the credibility of the alleged victim of a sexual assault, and highlighted the witness' testimony that he believed the victim in its closing arguments. The State candidly admits that the prosecutor's actions were improper.

The victim first reported the incident for which D.W.N. was convicted more than two years after it occurred (after earlier, specific denials). No physical evidence or other witness provided independent corroboration for her accusations. The prose-

cution's case depended entirely on the jury's assessment of the victim's credibility.

In these circumstances, prior decisions mandate that we reverse D.W.N.'s conviction and remand for a new trial, despite his counsel's failure to object to the patently improper testimony vouching for the victim's credibility.

The majority chooses not to follow the established Missouri precedent addressing this precise issue, however. Instead, the majority holds that plain-error review is unavailable here, because—according to the majority—"the totality of the circumstances before the trial court reflect[ed] a clear indication that counsel's actions in choosing not to object to otherwise objectionable testimony [was] guided by strategic considerations." Op. 826. The Missouri Supreme Court explained just two months ago, however, that in order for defense counsel's actions to waive plain-error review, " 'counsel [must have] affirmatively acted in a manner *precluding a finding* that the failure to object was a product of inadvertence or negligence.' " *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009) (emphasis added; citation omitted). The majority essentially concedes that standard cannot be met here, since it acknowledges—albeit begrudgingly—that "it is *theoretically possible* or *conceivable* that ... counsel did not realize, at the time Capps testified, that his victim credibility testimony was impermissible." Op. 824–25.

The record here does not support the majority's finding of a "clear indication" that defense counsel failed to object for strategic reasons. Unlike the cases on which the majority relies, none of the defense's arguments depended on, or were bolstered by, Capps' testimony that he believed the victim's statements that she had

been sexually assaulted in Chillicothe. D.W.N.'s attorney did not affirmatively solicit, or attempt to exploit, the testimony D.W.N. now challenges, but instead derisively labeled that testimony "voodoo science." Indeed, the defense's consistent argument that the jury should believe the victim's initial denial of abuse in Missouri is *flatly inconsistent* with Capps' vouching testimony. And the record suggests that counsel did not even properly understand the law in this area.

I respectfully dissent.

### I.

Preliminarily, I note that the prosecution's reliance on Investigator Capps' testimony vouching for the victim's credibility was considerably more extensive than the majority opinion indicates. Beyond the statements the majority quotes from Capps' direct and redirect examination, his testimony was also a focus of the prosecution's closing arguments. The prosecutor's initial closing argument spanned only six double-spaced pages of transcript in its entirety. Capps' testimony was a centerpiece of that brief argument:

> And I ask you to remember the testimony of Tommy Capps; Tommy Capps, who works for the State Technical Assistance Team and who works only on these cases with these children. I ask that you remember that he's done over 500 of these interviews. He told you the indicators of whether a kid is lying or telling the truth. *He told you that he thought [victim] was telling the truth about this incident in Chillicothe, Livingston County. He told you that he believed her,* and he gave you a good explanation for why she didn't tell the truth before. It wasn't that she's lying, but that when children receive these

traumatic events, they remember things gradually, not all at one time.

Later, the prosecutor argued that, "[y]ou heard testimony from [victim], [and] *you heard that testimony confirmed by Tommy Capps*."

As the majority notes, defense counsel's closing attacked Capps' credibility opinions by arguing that they were "voodoo science" and unreliable. Counsel asked the jury to disregard Capps' opinions, and instead believe the victim's initial denials of any sexual assault in Missouri. The prosecutor responded at the beginning of her rebuttal argument, by again asking the jury to defer to Capps' assessment of the victim's credibility:

> Now, I've got to clap for the defense attorney. I mean, for some reason—I don't know—maybe she'd gone to law school, but she has somehow bec[o]me a psychologist today, and she's telling you what you should and shouldn't believe. She's telling you, discredit Tommy Capps and his 500 investigations and his, what, 14 years of service and believe her, believe her because she represents the defendant, and she wants to create that reasonable doubt. I ask you not to believe her science, not to believe her psychology, but to believe the testimony here today.

Capps' testimony is particularly significant because of the material inconsistencies in the victim's pretrial statements. (These inconsistencies presumably explain why the prosecution felt compelled to solicit, and then so significantly rely on, Capps' credibility-vouching.) During her trial testimony, the victim acknowledged

that, when she first underwent a SAFE examination and interview in late March or early April 2005, she told the interviewer that "[n]one of it [*i.e.*, the abuse] happened in Missouri." The victim testified that she had agreed with the interviewer's statement that "it happened in Georgia and South Carolina, but not Missouri." The victim also agreed that the interviewer "asked [her] a couple of different times if anything happened in Missouri," but that she did not "tell her anything happened in Missouri." The victim initially told Capps, as well, that no abuse had occurred in this State:

Q. And do you recall that he asked you if you were sure nothing happened in Missouri?

A. Yes.

Q. Okay. And what did you tell him?

A. *I told him that I was sure.*

Capps confirmed that, when he first spoke with the victim, "I asked her if she was sure nothing had happened in Missouri, and she told me that nothing had happened in Missouri."[1] The victim first claimed that abuse had occurred in Missouri in late 2005 or early 2006, two and one-half years after the alleged misconduct.

## II.

As the majority opinion explains, "[p]lain error is evident, obvious, and clear error." Op. 817 (quoting *State v. Norman*, 178 S.W.3d 556, 560 (Mo.App. W.D.2005) (internal quotation marks and citation omitted)). There is little doubt that the admission of Capps' vouching testimony in this case satisfied this standard. In *State v.*

---

1. I assume these were not casual questions: although it has not been a focus of the parties' arguments, the State has essentially conceded

that jurisdiction would not have existed to prosecute D.W.N. for sexual abuse which may have occurred in Georgia or South Carolina.

*Churchill,* 98 S.W.3d 536 (Mo. banc 2003), a sexual abuse case involving a child victim, the Supreme Court emphasized that "expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury." *Id.* at 538–39. The Court held that "particularized testimony," namely "that testimony concerning a specific victim's credibility as to whether they have been abused," is prohibited: "when particularized testimony is offered, it must be rejected because it usurps the decision-making function of the jury and, therefore, is inadmissible." *Id.* at 539 (citing *State v. Williams,* 858 S.W.2d 796, 798–99 (Mo. App. E.D.1993)). "When an expert witness testifies that a particular witness is telling the truth, prejudice often arises because the expert's testimony invests scientific cachet to an issue (credibility) that the jury is capable of determining without an expert's help." *State v. Artis,* 215 S.W.3d 327, 339 (Mo.App. S.D.2007).

The fundamental principle on which *Churchill* relies—that witnesses may not offer opinions as to the veracity of statements made by other witnesses—is a longstanding, established rule of Missouri law.[2] Here, in violation of that principle, the prosecution asked explicit, direct questions of Investigator Capps, unambiguously designed to elicit his opinions of the victim's credibility; the prosecutor then made extensive, explicit references to Capps' vouching testimony in closing arguments.[3] This was "evident, obvious, and clear error," a point neither the State, nor the majority, appear to seriously contest.

I also believe that, under prior decisions involving similar testimony, there can be little doubt that Capps' testimony—and the prosecutor's extensive references to it in her closing argument—constituted a manifest injustice or miscarriage of justice sufficient to trigger plain-error relief.

Unlike this case, the Supreme Court's *Churchill* decision involved vouching testimony to which a contemporaneous objection was made. Nevertheless, its discussion of the prejudicial effect of the "brief" testimony in that case (apparently not referenced in the prosecutor's closing argument) is relevant here because of the strikingly similar factual context:

[T]he brief nature of Dr. Solomon's statements in no way reflect[s] the extent of their prejudice to Churchill. Dr. Solomon's testimony that A.T.'s alleged abuse "was real" infringed upon the decision-making function of the jury and prejudiced Churchill by bolstering A.T.'s

---

**2.** *See, e.g., State v. Middleton,* 995 S.W.2d 443, 459 (Mo. banc 1999) (" 'Generally, expert testimony is inadmissible if it relates to the credibility of witnesses because this constitutes an invasion of the province of the jury.' "; quoting *State v. Whitmill,* 780 S.W.2d 45, 47 (Mo. banc 1989)); *State v. Lawhorn,* 762 S.W.2d 820, 823 (Mo. banc 1988) ("Expert testimony is also inadmissible if it relates to the credibility of witnesses, for this constitutes an invasion of the province of the jury."); *State v. Taylor,* 663 S.W.2d 235, 239, 241 (Mo. banc 1984) ("expert testimony is not admissible as it relates to credibility of witnesses"; "Otherwise, trials could degenerate to a battle of

experts expressing opinions on the substance of witness' veracity.").

**3.** Although the State did not formally declare Capps to be an expert witness, it solicited testimony concerning his extensive experience investigating child sex abuse cases and conducting forensic interviews of the victims of such crimes. The State plainly sought to portray him as an individual with expertise concerning the credibility of child sex-abuse victims superior to that of a lay witness or jury member.

testimony with the credibility of a professional.

The testimony Dr. Solomon provided deprived Churchill of a fair trial because there was no physical evidence indicating that sexual abuse occurred. The testimony was prejudicial considering that the state's other evidence consisted solely of the child-victim's inconsistent accounts of the matter and her subsequent behavior, both of which were matters Dr. Solomon's testimony directly bolstered.

*Churchill,* 98 S.W.3d at 539 & n. 8 (citation omitted). In this case, like *Churchill,* "there was no physical evidence indicating that sexual abuse occurred," and the State's case rested solely on "the child-victim's inconsistent accounts of the matter and subsequent behavior." [4]

*Churchill* relied heavily on, and adopted the analysis of, *State v. Williams,* 858 S.W.2d 796 (Mo.App. E.D.1993). *Williams* found the admission of particularized testimony vouching for the accusations of a child sex-abuse victim to be plain error mandating a new trial. In doing so, it relies on factors which are equally applicable here: that the improper vouching testimony was highlighted by the prosecution in closing; and that the prosecution's case depended entirely on the credibility of the victim's allegations.

The error, here, gave rise to manifest injustice affecting substantial rights. . . . The State relied essentially on testimonial evidence of the victim's allegations to prove its case. In its closing argument, the State repeated and emphasized the significance of the doctor's opinion on credibility. Since the jury's verdict was the result of its impression of the witnesses' credibility, we hold that the doctor's opinion on the truthfulness of the victim manifestly prejudiced appellant by usurping the province of the jury. The danger was too great that the jury accepted the doctor's testimony as conclusive of appellant's guilt without making an independent determination of the victim's credibility. The doctor's statements amounted to an impressively qualified stamp of truthfulness on the victim's story, and a miscarriage of justice will result from a refusal to reverse for plain error.

*Id.* at 801.

Cases which have refused to find plain error where a witness has testified to the credibility of a sex-abuse victim rely on circumstances which are missing here: the fact that the defendant's guilt was established by physical evidence and/or the testimony of corroborating witnesses, and thus did not depend solely on the jury's assessment of the victim's credibility; [5] the fact that the statements at issue were brief

---

**4.** In another case involving a preserved claim of error, the Southern District similarly reversed for a new trial where "this basically was a 'he said-she said' credibility case with no confession, no eyewitnesses, and no physical evidence." *State v. Foster,* 244 S.W.3d 800, 803 (Mo.App. S.D.2008). The present case could be characterized in exactly the same fashion.

**5.** *State v. Chism,* 252 S.W.3d 178, 184 (Mo. App. W.D.2008) ("unlike in *Churchill* and *Williams,* the State adduced other evidence that corroborated the victim's story"; "As the State correctly points out, the presence of the corroborating evidence rather than the doctor's improper bolstering persuaded the jury to believe the victim."); *State v. Collins,* 163 S.W.3d 614, 623 (Mo.App. S.D.2005) (noting that victim's statements were corroborated by physical evidence she had been abused, by testimony of other witnesses, and in part by defendant's confession).

and were not highlighted in closing;[6] the fact that the statements were unsolicited, and there was accordingly no indication " 'that the prosecutor intentionally tried to inject unfair prejudice into the trial' ";[7] and the fact that the jury's verdict indicated that it did not uncritically believe all of a victim's testimony.[8]

Under these prior decisions, plain error justifying a new trial exists here because: (1) the prosecution intentionally and explicitly solicited improper testimony vouching for the child sex-abuse victim's credibility; (2) the prosecution solicited multiple improper vouching statements, and highlighted those statements in its closing argument; (3) the child-victim's prior statements were materially inconsistent; and (4) the prosecution's case depended entirely on the jury's belief in the victim's credibility, because there was no physical evidence or witness testimony to corroborate her allegations.

### III.

Prior Missouri decisions addressing plain-error claims in criminal cases—including cases addressing the *identical* issue we face today—have essentially conducted two inquiries: first examining the egregiousness or obviousness of a particular error; and then assessing the severity of its impact on the trial.[9] Rather than following this time-honored approach in connection with Capps' testimony, the majority instead forges its own path, adopting a test under which plain-error review is foreclosed whenever, in the eyes of a reviewing court, "the totality of the surrounding circumstances reflect a clear indication that trial counsel strategically chose not to object to the [later-challenged] evidence." Op. 825. The majority takes pains to emphasize that it is not finding that any (actual or conceivable) strategic decision was in fact the product of competent lawyering: "We take no position today on, whether or not, if D.W.N.'s trial counsel did have a strategic reason for choosing not to object, that strategy was reasonable." Op. 826.

Consideration of defense counsel's possible strategies does not fit neatly into the two-step plain-error analysis applied in prior Missouri cases, and discussed above. The Missouri Supreme Court has held, however, that defense counsel's trial strategies may waive plain-error review in certain circumstances. In *State v. Johnson*, 284 S.W.3d 561 (Mo. banc 2009), the Missouri Supreme Court only recently held that "[p]lain error review does not apply when 'a party affirmatively states that it has no objection to evidence an opposing party is attempting to introduce' or [fails to object] for a trial strategy reason." *Id.* at 582 (quoting *State v. Mead*, 105 S.W.3d 552, 556 (Mo.App. W.D.2003)); *see also Mead*, 105 S.W.3d at 555–56 (" 'If . . . the party *consciously refrains from objecting as a tactical matter*, then that action constitutes a true "waiver," which will negate even plain-error review.' " (citation omitted; emphasis added by *Mead* )). But to constitute a waiver of plain-error review,

---

6. *State v. Wright*, 216 S.W.3d 196, 200 (Mo. App. S.D.2007); *State v. Artis*, 215 S.W.3d 327, 340–41 (Mo.App. S.D.2007); *Collins*, 163 S.W.3d at 623.

7. *Artis*, 215 S.W.3d at 340 (citation omitted).

8. *State v. Fewell*, 198 S.W.3d 691, 698 (Mo. App. S.D.2006).

9. Notably, this is the approach the majority follows in addressing D.W.N.'s second Point. *See* Op. 827–29.

*Johnson* holds that " 'counsel [must have] affirmatively acted in a manner **precluding a finding** that the failure to object was a product of inadvertence or negligence.' " *Johnson,* 284 S.W.3d at 582 (emphasis added; quoting *Mead,* 105 S.W.3d at 556).

As explained in § IV, below, the record in this case cannot fairly be said to "preclud[e] a finding" that defense counsel failed to object from simple inadvertence. Indeed, the majority's own characterization prevents this case from falling within the waiver doctrine described in *Johnson:* the majority allows that "it is *theoretically possible* or *conceivable* that ... counsel did not realize, at the time Capps testified, that his victim credibility testimony was impermissible." Op. 824. The majority's recognition that the present record does not "preclude a finding" of inadvertence is also reflected in its statements that, in a future Rule 29.15 proceeding, D.W.N. will be entitled to show both that his counsel had no strategic reason for not objecting to Capps' testimony, and that, even if counsel acted from strategic considerations, her strategy was unreasonable. *Id.* at 826. Thus, the majority itself effectively admits that this record would *permit*— not *preclude*—"a finding that the failure to object was a product of inadvertence or negligence."

The cases on which the majority principally relies—*State v. Collins,* 163 S.W.3d 614 (Mo.App. S.D.2005), and *State v. Hamilton,* 892 S.W.2d 774 (Mo.App. S.D. 1995)—illustrate the sorts of actions of defense counsel which can "preclude a finding" of inadvertent failure to object.

In *Hamilton,* defense counsel actually asserted an objection to particular testimony, then withdrew that objection. *Id.* at 777. As *Johnson* explains, a defendant may waive even plain-error review where his counsel affirmatively states that he has no objection to particular evidence or testimony. The situation in *Hamilton*—an objection asserted, then withdrawn—similarly shows an explicit, affirmative acceptance, inconsistent with any later challenge.

In *Collins,* the defendant affirmatively relied at trial upon the credibility-vouching testimony he later challenged on appeal. In *Collins* a prosecution witness (Brown) testified to the credibility of a victim's account of sexual abuse, based in part on the fact that the victim had related "credible idiosyncratic detail[s]" about the incident when describing it (*i.e.,* specific, extraneous details about the circumstances surrounding the incident). 163 S.W.3d at 619. Brown testified that "kids of this age aren't smart enough to make up" such "idiosyncratic details," because "they don't know those are important pieces of information or evidence." *Id.*

The appellate court in *Collins* emphasized that "it was important to the defense that it ... convince the jury that Victim's statements implicating others as her abuser were credible," and explained the victim's physical injuries. *Id.* at 621. The defense's trial strategy also entailed "emphasiz[ing] Brown's testimony about her first two interviews with Victim in which Victim said Defendant had touched her, but never said Defendant did so in a sexual way or that he penetrated her vagina or anus." *Id.*

*Collins* emphasized that defense counsel *affirmatively employed* Brown's "credible idiosyncratic detail" test in advancing these defense strategies:

To bolster the "innocent touching" defense, Defendant needed the jury to believe Victim told the truth in her initial

two interviews with Brown. Under the circumstances, Brown's "idiosyncratic detail" testimony supported Defendant's trial strategy. This follows because in her initial two interviews, Victim provided no "idiosyncratic detail" about the touchings; the implication being that the touchings were not sexual abuse and nothing out of the ordinary occurred.

Our conclusion that Defendant consciously chose not to object to Brown's "idiosyncratic" detail comment is bolstered by the following. Throughout the trial, Defendant focused on Victim's account of abuse inflicted on her by Walker. In doing so, defense counsel hammered upon the fact that Victim gave explicit, detailed statements about the abuse Walker committed, but did not do so when talking about what Defendant did to her. This started in opening argument....

Having thus outlined to the jury the anticipated contrast between Victim's detailed account of Walker's abuse and her less detailed account of what Defendant did to her, defense counsel was then able to use Brown's "credible idiosyncratic detail" comments to support his defense strategy. For example, counsel asked Brown [about specific details Victim had given concerning the alleged abuse by Walker]. Defense counsel then asked if this statement was "one of those idiosyncratic details that would go to support what she's saying," and Brown answered, "Yes."

*Id.* at 621–22; *see also id.* at 622 ("Defendant wanted the 'idiosyncratic detail testimony' before the jury ... to support the notion that Victim was truthful when describing sexual abuse *only* when she provided explicit details. The inference counsel wanted the jury to draw was that no sexual abuse occurred by Defendant because no details were provided...."). *Collins* also specifically noted that the strategy of casting blame on another abuser, as to whom the victim had provided "credible idiosyncratic details," "was the only strategy that might reasonably work" because—unlike here—"*the physical evidence of abuse was undeniable.*" *Id.* (emphasis added).

The third such case the majority cites is similar: the Court refused to engage in plain-error review where "counsel chose not to object but instead to exploit" challenged testimony; in such circumstances, the defendant "may not now be heard to complain of a chosen trial strategy." *State v. Valentine*, 584 S.W.2d 92, 97 (Mo. banc 1979), overruled on other grounds, *Sours v. State*, 593 S.W.2d 208, 210 (Mo. banc 1980).

*Collins, Hamilton,* and *Valentine*—and additional, similar cases[10]—reach a common-sensical result: a defendant cannot argue plain error on appeal where, in the trial court, he affirmatively invited and/or relied upon the evidence he later challenges. In such cases, defense counsel's

---

10. *See, e.g., State v. Martin*, 852 S.W.2d 844, 851 (Mo.App. W.D.1992) ("[D]efense counsel, from the inception of the trial, consciously elected not to oppose introduction of A.M.'s out-of-court statements to demonstrate prior inconsistent statements.... [A]ppellant's trial strategy that included intentionally not objecting to allegedly inadmissible evidence cannot be a basis to invoke the 'plain error' rule for appellate review of evidence appellant sought to use to his advantage at trial."); *State v. Rowe*, 806 S.W.2d 122, 127 (Mo.App. E.D. 1991) ("It is clear that appellant wanted to use the evidence of his drug use to undermine the credibility of his confession. Where a defendant fails to object and actively joins in the presentation of evidence to the jury, he may not argue later that the admission of the evidence was error.").

actions can fairly be said to " 'preclud[e] a finding that the failure to object was a product of inadvertence or negligence.' " *Johnson*, 284 S.W.3d at 582 (citation omitted). As I explain below, however, this is not such a case.

## IV.

Under the cases on which the majority relies, the issue here becomes: did D.W.N.'s counsel invite, solicit, exploit, endorse, or affirmatively rely on Capps' testimony that he believed the victim's account of sexual abuse in Missouri, despite her repeated and explicit earlier denials of such abuse? I conclude that the record provides no basis to find a "clear indication" that counsel had strategic reasons for failing to object to the testimony D.W.N. now challenges.

## A.

The majority relies first and foremost on the fact that defense counsel's principal strategy was—in the majority's view—to stand on the victim's initial denial of any sexual assault in Missouri, and argue that her later turnaround was not credible.

Unlike in *Collins*, however, none of the defense examination or argument detailed at length in the majority opinion either (a) affirmatively endorsed or adopted Capps' credibility assessments, or (b) depended on the admission of the challenged testimony. Moreover, unlike in *Collins*, counsel did not espouse Capps' "test" for determining credibility (in fact, defense counsel ridiculed Capps' credibility opinions as "voodoo science").

It must be remembered that the essence of Capps' challenged vouching testimony was that, despite the victim's earlier denials of any sexual assault in Missouri, and

the delay in her ultimate disclosure of alleged abuse here, her final account was trustworthy. This is made evident in an excerpt from Capps' testimony which the majority omits, by ellipsis, from its first transcript quotation:

Q. Did you pick up any of those signs of lying with [the victim]?

A. No.

Q. Okay. Now, you're aware that [the victim] gave an interview before?

A. Yes.

Q. And that she flat out said none of this happened in Missouri, right?

A. I'm—I'm familiar with that.

Q. And you are also aware that she actually told you that nothing happened in Missouri?

A. Yes.

Q. Do you think it's uncommon for a child to say later that something happened?

A. Oh, no. I think that that's—that's where a lot of people misunderstand a disclosure from a child, because a disclosure is—is—is not an event. A disclosure is—leads up to an event. And so a lot of times, disclosure comes a little bit at a time; it doesn't just happen.

Q. Okay. So it's not uncommon for a child to deny something happened in one state and then later remember something else, correct?

A. It's not too unusual for one of them to tell you something and then recant at a later time.

Q. Okay. But in this matter, do you think [the victim] was telling the truth?

A. Yes.[11]

While defense counsel did in fact argue that the jury should believe the victim's initial statements, rather than her later ones, counsel made this argument without any reference to Capps' belief in her later account, and did not need Capps to testify that he believed the victim in order to make the defense argument. Indeed, the defense argument was directly contrary to the Capps testimony D.W.N. now challenges. And while defense counsel *responded* to Capps' credibility-vouching by seeking to undercut and belittle it (*e.g.*, by labeling it "voodoo science" in closing, or obtaining Capps' admission that there were no "bright-line rules" to assess credibility), this does nothing to suggest that counsel *affirmatively wanted Capps' vouching testimony to be admitted* in order to "set up" her responsive arguments.[12]

Of course, as part of the defense strategy, D.W.N.'s counsel solicited, and affirma-

tively relied on, testimony concerning the victim's prior inconsistent statements in Capps' initial interview of her. To this extent, I agree "that defense counsel *needed* Capps' testimony." Op. 824 n. 5 (emphasis original). But Capps' factual testimony as to what the victim initially told him is a separate matter from his opinion testimony vouching for the truthfulness of the victim's later version of events—I assume we can all agree that D.W.N. could solicit testimony from Capps concerning one *matter*, without waiving the right to challenge *other* testimony he offered. In a similar vein, I acknowledge that defense counsel was likely aware that, in light of the trial court's *limine* rulings, if she solicited testimony from Capps and the victim as to her earlier denials of abuse in Missouri, evidence would come in that the victim had accused D.W.N. of abuse elsewhere in those same conversations. But even if D.W.N. thereby waived any objection to testimony concerning the victim's South Carolina and Georgia accusations,

---

11. The majority states that "Capps never actually testified [that] the victim's description of sexual abuse to him during his second interview ... occurred in Missouri," and that "he never actually state[d] which of her statements (or both) he believe[d]." Op. 818 n. 2. Capps testified, however, that his second interview of the victim occurred after her mother informed him that the victim had now disclosed abuse in Missouri, and he described in some detail the sexual acts the victim recounted in the second interview. Moreover, as explained in the text, the whole tenor of Capps' credibility-vouching testimony was that the victim's initial denials of sexual abuse in Missouri, followed by her later disclosures, were consistent with the behavior of other sex-abuse victims, and did not affect his belief in her Missouri accusations (which were the only accusations actually on trial, after all). In her closing the prosecutor herself argued that Capps "told you that he thought [the victim] was telling the truth *about this incident in Chillicothe, Livingston County.* He told you that he believed her, and he gave you

a good explanation for *why she didn't tell the truth before.*"

12. Struggling to fit this case into the *Collins* mold, the majority opinion states that "[p]resumably, defense counsel did not oppose testimony from Capps that the victim was 'credible' when she made [her initial] statement[, denying abuse in Missouri,] to Capps." Op. 823 n. 4; *see also* Op. 824 n. 5 ("it is clear that defense counsel *needed* Capps' testimony that Capps *believed* the victim was *credible* when she first told Capps that the abuse did not occur in Missouri"; emphasis original). The short answer is that Capps never testified that he found the victim's initial account "credible." Instead, his testimony explained why her belated disclosure of abuse in Missouri, despite earlier denials, was worthy of belief, and was consistent with the behavior of other sex-abuse victims. Notably, in closing the prosecutor reminded the jury that Capps "gave you a good explanation for *why she didn't tell the truth before.*"

that appears—once again—entirely beside the point.[13]

*Collins* and similar cases have found a waiver of plain-error review only where defense counsel affirmatively relied on (and in some cases invited) objectionable testimony in order to serve the defense's own purposes. Nothing of the sort happened here.

### B.

The majority concludes "that [defense] counsel was aware of the well-established rule that a witness cannot vouch for the credibility of the victim," Op. 823, based on her objections to the testimony of the very next witness, Chillicothe Police Lieutenant Tony Kirkendoll. But defense counsel's later objections reflect a misunderstanding of the law in this area. Rather than showing that counsel made an informed strategic decision to selectively permit Capps' credibility-vouching, but bar Kirkendoll's, counsel's objections to Kirkendoll's testimony confirm that the failure to object to Capps' testimony arose from inadvertence or neglect—precisely the circumstance in which plain-error review *should be* available.

Kirkendoll's testimony is brief, occupying just two pages of transcript. After having Kirkendoll testify to his seven and one-half year tenure with the Chillicothe Police Department, and an aborted attempt to have him explain his prior famil-

iarity with D.W.N., the following is the entirety of Kirkendoll's testimony:

Q. ... [Y]ou were present when [victim] was interviewed by Mr. Capps; is that correct?

A. That's correct.

Q. You sat in on the entire interview?

A. Yes.

Q. Okay. Now, how many times have you sat in on these types of interviews?

A. I would estimate over a hundred.

Q. Okay. And so you, also, are familiar with when a child is telling the truth and when a child is lying?

A. Yes, I feel I am.

[Defense counsel]: Your Honor, actually, I would object. *Just because he's watched interviews I don't think that gives him any specialized knowledge as to whether somebody is telling the truth or not.*

[Prosecuting attorney]: Your Honor, *I'll lay a foundation for that.*

Q. (By [prosecuting attorney]) Lieutenant Kirkendoll, do you have the training regarding child—child—children witnesses?

A. Yes, I do.

Q. What kind of training do you have?

A. I've been through the Reid interrogation class. I've also been through

---

**13.** While defense counsel may have asked the jury to disregard the victim's accusations of abuse in South Carolina and Georgia, I cannot agree that this case was defended solely on the basis of *"where* abuse occurred versus *whether* abuse occurred." Op. 821 (emphasis original); *see also* Op. 824 n. 5 (suggesting that this case did not involve "a legitimate defense as to *whether* abuse occurred, instead of *where* it occurred"; emphasis original). I

am uncertain what more the majority would expect the defense to do in order to mount what it would deem "a legitimate defense as to whether abuse occurred." The Second Amended Information on which D.W.N. was tried only alleged abuse "on or about March 2003, in Livingston County, Missouri"; from my review of the record, the defense's constant theme was that *that* abuse never happened.

advanced Reid. I've also taken child abuse investigation classes.

Q. And so that you are familiar with the children and the way that they testify?

A. Yes, I am.

Q. And the way that they behave in a forensic examination?

A. Yes.

Q. Okay. And you, again, were present when [victim] was giving a forensic interview to Tommy Capps?

A. Yes, I was.

Q. Okay. Do you believe she was being truthful?

[Defense counsel]: Your Honor, I'm going to object to this question. *I don't believe there has been a proper foundation laid for this witness to be an expert as to whether a child is telling the truth or not.* I think it's invading the province of the jury. It is for the jury to decide for themselves whether [the victim] was telling the truth, and I don't believe that Officer Kirkendoll can assist in that.

[Prosecuting attorney]: Your Honor, I'll withdraw the question. And I have no more questions of this witness.

From defense counsel's objections to Kirkendoll's testimony, the majority concludes that "it is clear that D.W.N.'s trial counsel was aware of both the governing law and the ramifications of Capps' testimony," and thus "that D.W.N.'s counsel had a strategic reason for objecting to the police officer's (Lt. Kirkendoll) testimony while choosing not to object to Capps' improper vouching for the victim's credibility." Op. 824.[14] I draw exactly the opposite conclusion, however. Defense counsel's first objection plainly stated her understanding that only witnesses with "specialized knowledge" may testify "as to whether somebody is telling the truth or not," and that Kirkendoll did not possess the required level of expertise "[j]ust because he's watched interviews." The prosecutor responded by stating that she would lay a fuller foundation. After the prosecutor attempted to show Kirkendoll's "expertise" in evaluating the credibility of child sexual abuse victims, defense counsel again objected on the basis that "a proper foundation" was lacking to demonstrate Kirkendoll's "expert[ise] as to whether a child is telling the truth or not," and the prosecution abandoned further inquiry.[15]

These objections reflect a fundamental misunderstanding of the governing law.

---

**14.** The majority also suggests that—although Kirkendoll's intended credibility-vouching was categorically inadmissible—defense counsel may have intentionally chosen, as a strategic matter, to initially assert an " 'expert foundation' objection [that] was not the appropriate objection," Op. 824, and thus intentionally chose to permit Kirkendoll's direct examination to continue. While anything is possible (particularly if the Court is unconcerned with the reasonableness of such an imputed strategy), there is no "clear indication" on this record that counsel intentionally interposed a meritless objection, rather than the winning one that was available to her. Even if the majority's point is that counsel could conceivably have concluded that it was *more important* to prevent credibility-vouching testimony from Kirkendoll than from Capps, no rule of law limited defense counsel to only one "improper bolstering" objection.

**15.** I must also express some concern that the prosecution apparently called Lieutenant Kirkendoll to testify on two issues, neither of which appears proper, and both of which the prosecution abandoned (without a ruling from the court) when defense counsel objected: first, Kirkendoll's prior familiarity with D.W.N. (which apparently involved D.W.N.'s prior employment with the Chillicothe Police Department, and his dismissal from that employment), and second, Kirkendoll's opinions as to the victim's credibility.

Under *Churchill* and the cases cited *supra* note 2, no witness has the "specialized knowledge" to specifically vouch for the credibility of a child sexual abuse victim in a Missouri criminal trial. This is not a question of laying "a proper foundation" concerning a specific witness' education, training, or experience; instead, such testimony is *categorically inadmissible.* Evidently, defense counsel believed Kirkendoll was subject to challenge because of his lack of sufficient "expertise," but that Capps—with his hundreds of forensic interviews and years of experience—was not. This was not, and could not be, a reasonable strategic basis for failing to object to Capps' testimony.[16]

## V.

I believe the majority opinion represents an unwarranted departure from prior Missouri caselaw involving the plain-error rule generally, and that rule as applied to testimony vouching for the credibility of sex-abuse victims, in particular. I respectfully dissent, and would reverse the judgment and remand for a new trial.[17]

---

16. In a footnote, the majority also argues that "[t]he absence of this claim in [defense counsel's] motion for new trial supports the conclusion that counsel chose not to object for strategic reasons." Op. 824 n. 5. To the contrary, I cannot think of any strategic reason for continuing to hold an objection in reserve *after D.W.N. had been convicted.* Rather, the failure to include this issue in the new trial motion more likely reflects counsel's lack of awareness that Capps' plainly improper testimony was objectionable at all.

17. Based on my conclusion that D.W.N.'s first Point Relied On entitles him to a new trial, I find it unnecessary to address his second Point, concerning alleged instructional error.