STATE of Missouri, Respondent,

v.

**Kirk FINCHER, Appellant.**

**No. WD 73262.**

Missouri Court of Appeals, Western District.

Feb. 28, 2012.

Frederick J. Ernst, Assistant Appellate
Defender, Kansas City, MO, for Appellant.

Chris Koster, Attorney General, Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division II: GARY D. WITT, Presiding Judge, and JOSEPH M. ELLIS and MARK D. PFEIFFER, Judges.

MARK D. PFEIFFER, Judge.

Kirk Fincher appeals the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), entered upon a jury verdict finding him guilty of murder in the first degree, § 565.020, RSMo 2000, and armed criminal action, § 571.015, RSMo 2000. The trial court sentenced him to life imprisonment without parole on the murder count and twenty years imprisonment on the armed criminal action count, to be served concurrently. Fincher raises two issues on appeal, asserting that the trial court: (i) plainly erred in failing to declare a mistrial *sua sponte* after he claims a reference was made by a witness to Fincher's post-*Miranda* silence; and (ii) abused its discretion in overruling Fincher's objection to the State's closing argument. We affirm.

**Facts and Procedural History[1]**

A few days after Christmas in December 2008, Felicia Collins was in her Kansas City, Missouri, apartment, located at 116 North Belmont Avenue, with her brother, Suede Saenz; Miguel Love; Bethany Brashear; and Fincher. Her brother, Love, Brashear, and Fincher left. Later in the day, Debra Courtney, Suede Saenz's girlfriend; Larry Saenz, Collins's father; Simone Courtney, Debra Courtney's sister; Collins's two children, Knowledge and Wisdom; Chloe Saenz, Collins's sister; and Jeremy John and his girlfriend, Lau-

ren, were in Collins's apartment, "hanging out, trying to chill and drink." John went out the back door and made a telephone call. When he returned in about five minutes, he left the back door unlocked. Less than a minute later, five masked and armed men entered the apartment, robbed Collins, and assaulted Collins and her father.

Suede Saenz, Love, Brashear, and Fincher returned to Collins's apartment after the robbery. Collins told them that John "had let five dudes in the house" and was responsible for the robbery. Fincher told Collins that he was "going to take care of" John or "going to get" John. Simone Courtney heard Fincher say that he had a bullet with John's name on it to go in John's head.

On December 30, 2008, several people were at Collins's apartment, including Simone Courtney and Fincher. Simone Courtney saw that Fincher had a "black 40" gun. Collins needed assistance with a jack for her car, and after locating a jack, Fincher walked it down to her car. Collins went into her bedroom and looked out the window to watch Fincher. He put the jack down by the tire, took a gun out of his pants, and put the gun in the back seat of Collins's car. Collins then saw a white car, which she recognized as one that John had previously driven, pull into the apartment parking lot. She saw Fincher grab the gun out of the seat, aim for the car, and fire. After Fincher fired, the white car crashed into the side of Collins's apartment building.

Collins ran into the living room and told everyone to go out the front door. Collins was leaving by the back door when Fincher ran up the back stairs. He told Collins, "I shot him" or "I got him." Collins told

---

1. We view the facts in the light most favorable to the jury's verdict. *State v. Celis–Garcia,* 344 S.W.3d 150, 152 (Mo. banc 2011).

Fincher that he needed to leave. Fincher ran away, wearing a red hoodie.

Collins went down to the parking lot and saw Ryan Onckelet's girlfriend "freaking out." Collins looked into the white car and saw Onckelet was bleeding and not breathing. Collins called the police.

Kansas City, Missouri, police officer Michael Buckley received a dispatch regarding a shooting at 116 North Belmont Avenue. When he arrived, he found Onckelet slumped over in the driver's seat of a white Saturn. Paramedics attempted to assist Onckelet, but he was pronounced dead at the scene. In the middle of the apartment complex parking lot, a crime scene technician located a fired cartridge casing, with the letters J–E–R–E–M writ-ten in black marker on the casing. She observed that the victim had an apparent bullet hole to the base of the left side of his skull and that there was blood in the right rear floorboard behind the passenger seat.

The deputy medical examiner who per-formed the autopsy on Onckelet deter-mined that Onckelet had been shot in the head from a distance of approximately three feet or more and that the gunshot wound caused Onckelet's death.

Simone Courtney went to Ralph Brash-ear's house after the shooting. She called Fincher to pick her up and take her home. On the way to Courtney's house, Fincher stopped, got out of the van, and burned the red hooded jacket he had been wearing prior to the shooting. When they arrived, Fincher and the other people with him, went inside. Simone Courtney heard Fincher tell them that "he shot the kid. It wasn't supposed to be that kid that he shot. It was supposed to be for Jeremy [John], but he deserved it. He shouldn't have been in the way." Fincher then had everyone, except Simone Courtney's moth-er, go into Simone Courtney's bedroom.

He told them: "[Y]es, I'm the one that shot him and I swear to God—I swear to God that no one better not talk. They better not snitch because I'll kill anyone. I don't care."

Later that night, around midnight, Fincher and several other people drove to a gas station. Antonio Love saw Fincher point the "murder weapon" at two men who had refused to leave after the owner of the station told them to get off his property. Some patrolling police officers observed a disturbance in the gas station parking lot and pulled into the station. One of the officers observed an individual inside the van pointing a gun at the two men. Fincher slid the gun under the seat toward the back of the van. The officers had all of the occupants of the van exit the vehicle. The officers searched the van and found a .40 caliber semi-automatic handgun with seven live rounds lying un-derneath the rear passenger seat on the driver's side. The officers released the in-dividuals at the scene.

Subsequent analysis of the shell casing recovered at the scene of Onckelet's homi-cide by the Kansas City police crime labo-ratory revealed that it had been fired from the firearm found in the van. However, no latent fingerprints of value for identifica-tion could be developed from the gun.

On January 5, 2009, Kansas City, Mis-souri, homicide Detective Venasa Ray in-terviewed Fincher in connection with her investigation of Onckelet's death. Detec-tive Ray asked Fincher if he was present during the residential robbery. Fincher stated that he had left Collins's residence just prior to the robbery. When he came back, he saw Jeremy John and three masked individuals running from the apartment. When Fincher told the detec-tive that he believed John was responsible for the robbery, she observed that he was

visibly angry and agitated. When Detective Ray asked Fincher about the shooting, he told her that he was alone in the parking lot at the time of the shooting when "he heard the shot and a loud boom and heard a woman screaming somebody had been shot." He said he then "ran back upstairs to the apartment and told everybody to leave because somebody had gotten shot." Detective Ray asked Fincher why he left the scene prior to the police arriving; he stated "he did not like the police and he had warrants." Fincher told the detective that he was wearing a longsleeve T-shirt while he was in the parking lot and asked to borrow Antonio Love's hooded jacket. After fleeing the scene, Fincher said he and another individual went to two different houses looking for friends, and they finally went to 3301 Spruce where they stayed the rest of the night.

When Detective Ray questioned Fincher about the incident at the gas station, he said that he "forgot" about the incident. He stated that he and his friends were riding around in the van when they were stopped by the police and that the police located a handgun in the van. Fincher stated that he did not know who owned the handgun. Officer Ray then advised Fincher that he had been identified as the shooter. According to Officer Ray, "Fincher said he didn't do it, and shortly after that, he quit talking."

The State subsequently obtained an indictment charging Fincher with murder in the first degree, § 565.020, and armed criminal action, § 571.015. At trial, after the State presented its case-in-chief, the defense rested without presenting any evidence. Fincher moved for a judgment of acquittal at the close of the State's evidence and at the close of all the evidence; both motions were denied by the trial court. The jury deliberated and found Fincher guilty as charged. Fincher moved for a judgment of acquittal or, in the alternative, for a new trial; the trial court denied the motion. The trial court sentenced Fincher to life imprisonment without parole on the murder count and twenty years imprisonment on the armed criminal action count, to be served concurrently.

Fincher appeals.

## Point I

In his first point, Fincher contends that the trial court plainly erred in failing to declare a mistrial *sua sponte* when Detective Ray testified that, during her interview of Fincher, when she advised Fincher that he had been identified as the shooter, "Fincher said he didn't do it, and shortly after that, he quit talking." On appeal, Fincher argues that this testimony constituted a comment on Fincher's post-*Miranda* silence and violated the holding of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, Fincher did not object to this testimony at trial.

## Standard of Review

Rule 30.20 authorizes us to consider, in our discretion, "plain errors affecting substantial rights" when we find "that manifest injustice or miscarriage of justice has resulted therefrom." "The 'plain error' rule should be used sparingly and is limited to those cases where there is a strong, clear demonstration of manifest injustice or a miscarriage of justice." *State v. Frazier*, 927 S.W.2d 378, 379 (Mo. App. W.D.1996). Plain error review is a two-step process. *State v. Rios*, 314 S.W.3d 414, 422 (Mo.App. W.D.2010). "First, we determine whether or not the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id.* (internal quotation omitted). Error is plain if it is evident, obvious, and

clear. *Id.* If we do not find plain error on the face of the claim, we should decline to exercise our discretion to review the claimed error under Rule 30.20. *Id.* If we do find plain error on the face of the claim, we have the discretion to proceed to the second step to consider whether a manifest injustice or a miscarriage of justice will result if the error is left uncorrected. *Id.*

### Analysis

On direct examination, the following exchange occurred between the State and Detective Ray:

> [THE STATE]: At some point did you relay to the Defendant information that you had received about this case?
>
> [DET. RAY]: Yes, I did.
>
> [THE STATE]: What did you relay to him?
>
> [DET. RAY]: I advised him that he was ID'd as a shooter.
>
> . . . .
>
> [THE STATE]: What was his reaction to that?
>
> [DET. RAY]: He said he didn't do it, and shortly after that, he quit talking.

Fincher's counsel did not assert an objection, did not request a mistrial, and did not ask the trial court to instruct the jury to disregard Detective Ray's mention that Fincher "quit talking" after she advised him that he had been identified as the shooter. Fincher now asserts that the trial court's failure to *sua sponte* declare a mistrial after he claims Detective Ray commented on Fincher's post-*Miranda* silence in violation of *Doyle*, 426 U.S. 610, 96

S.Ct. 2240, was prejudicial error rising to the level of a manifest injustice or miscarriage of justice.

▮▮▮▮ Where the appellant asserts plain error resulting from *Doyle* violations, "[w]e first determine whether any of these specific references actually crossed the *Doyle* line and, therefore, were erroneous." *State v. Cornelious*, 258 S.W.3d 461, 465 (Mo.App. W.D.2008).[2] "[P]ost-*Miranda* silence cannot be used as evidence to incriminate a defendant." *State v. Brooks*, 304 S.W.3d 130, 133 (Mo. banc 2010). *Doyle* held that reference to a defendant's silence *after the defendant has been arrested and given his Miranda warnings* is error because *Miranda* warnings "carry an implicit 'assurance that silence will carry no penalty.'" *State v. Barton*, 240 S.W.3d 693, 703 (Mo. banc 2007) (quoting *Doyle*, 426 U.S. at 618, 96 S.Ct. 2240).

Fincher relies on *State v. Dexter*, 954 S.W.2d 332 (Mo. banc 1997), to support his contention. We find that *Dexter* is distinguishable on its facts in that Dexter—unlike Fincher—had already been advised of his *Miranda* rights before agreeing to talk to the detective. *Id.* at 339. After the detective summarized the evidence implicating Dexter in his wife's murder and told Dexter that he did not believe Dexter was being truthful, the detective placed Dexter *under arrest* and, at that time, Dexter refused to answer any more questions without his attorney present. *Id.* at 338. The *Dexter* Court found that the detective's testimony recounting Dexter's *post-arrest, post-Miranda warnings* silence and the prosecutor's closing argu-

---

**2.** Only if an evident, obvious, and clear *Doyle* violation occurred, do we analyze whether that violation, in the context of the entire record, had a decisive effect on the jury and led to a manifest injustice or miscarriage of justice, by considering: (1) whether the government made repeated *Doyle* violations; (2) whether any curative effort was made by the

trial court; (3) whether the defendant's exculpatory evidence is transparently frivolous; and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming. *State v. Brooks*, 304 S.W.3d 130, 137 (Mo. banc 2010). In this case, because we find that no *Doyle* violation occurred, we do not engage in the second step of the analysis.

ments referring thereto violated *Doyle*, requiring reversal of Dexter's first-degree murder conviction and remand for a new trial. *Id.* at 338, 344.

 In this case, however, there is no evidence in the record that Fincher had been arrested or that he had been Mirandized at the time he voluntarily participated in questioning by Detective Ray. *See State v. Graves*, 27 S.W.3d 806, 810 (Mo. App. W.D.2000) ("Since the record does not reveal when, if ever, *Miranda* warnings were issued [and neither the defendant nor the State alleged that *Miranda* warnings had been given], we assume they were not issued before the time of Ms. Graves' impugned silence."). Detective Ray testified that in the course of her investigation of the homicide, she interviewed Fincher in an interview room at police headquarters. She questioned him about the robbery that occurred the night before the shooting and about the shooting. Fincher admits on appeal that "[t]he record in this case is not clear whether *Miranda* warnings were given to [Fincher]." Similarly, there is no evidence in the record that Fincher was under arrest when he was interviewed by Detective Ray. "*Doyle* is expressly limited to the use of silence '*at the time of arrest and after receiving Miranda warnings.*'" *Barton*, 240 S.W.3d at 703 (quoting *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240). Given that there is

no evidence in the record that Fincher had been arrested or issued *Miranda* warnings prior to his impugned silence during his voluntary statement, there was no *Doyle* violation in this case and the trial court did not err in failing to declare a mistrial *sua sponte*.[3] Point I is denied.

## Point II

In his second point, Fincher contends that the trial court erred in overruling his objection to the State's closing argument, in which he claims the prosecutor improperly vouched for the truthfulness of a witness's testimony and commented on facts not in evidence.

### Standard of Review

 "A trial court maintains broad discretion in the control of closing arguments." *State v. Forrest*, 183 S.W.3d 218, 226 (Mo. banc 2006) (internal citation omitted). We review preserved objections to errors in closing argument under an abuse of discretion standard, and we will not reverse a trial court's ruling about an argument unless "it amounts to prejudicial error." *Id.* (internal quotation omitted). "[T]he defendant has the burden to prove he was prejudiced by the improper argument, and prejudice is present only if the complained of comment had a decisive effect on the jury's decision." *State v.*

---

**3.** Furthermore, Fincher did not object to or seek any relief from Detective Ray's testimony. Plain error review applies when no objection is made due to " 'inadvertence or negligence.' " *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009) (quoting *State v. Mead*, 105 S.W.3d 552, 556 (Mo.App. W.D.2003)). "Plain error review is waived when 'counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence.' " *Id.* (quoting *Mead*, 105 S.W.3d at 556). "Plain error review does not apply when 'a party affirmatively states that it has no objection to evidence an opposing party is attempting to

introduce' or for a trial strategy reason." *Id.* (quoting *Mead*, 105 S.W.3d at 556). Out of an abundance of caution and outside the presence of the jury in Fincher's trial, the trial court raised the possibility of a "*Doyle* issue" with counsel and offered Fincher's counsel the opportunity to make a record of any argument on the topic and to request a mistrial or other curative relief. Fincher's counsel affirmatively stated, "Judge, I have no record," and indicated that he preferred to proceed with the trial. By this affirmative action of defense counsel, Fincher waived plain error review on the topic of any alleged *Doyle* violation.

*Steele,* 314 S.W.3d 845, 851 (Mo.App. W.D. 2010). "[C]ounsel is traditionally given wide latitude to suggest inferences from the evidence on closing argument." *State v. Gaines,* 316 S.W.3d 440, 456 (Mo.App. W.D.2010) (internal quotation omitted).

### Analysis

Both Fincher and the State commented on the veracity of the witnesses during closing arguments. Fincher's counsel argued:

> The State is asking you to believe a witness whose name is Felicia Collins and to believe her beyond a reasonable doubt. The State is asking you to deprive Kirk Fincher, a young man 17 years old at the time of this shooting, of his life and liberty and convict him of murder in the first degree based on the evidence you've heard in the last two days.
>
> . . . .
>
> Let's turn to the witnesses that you heard that weren't law enforcement officers, that weren't experts. . . .
>
> The ones who came in and swore an oath, testified to you, the finders of fact, the people that decide what are the facts in this case, the real truth of this case. The people who had a good chance to consider the demeanor of the witnesses as they testified before you. To get a good opportunity to look these witnesses in the eye if you could and to see what they were really thinking.
>
> Two of them were in custody, in jail, restrained of their liberty because of their failure to cooperate in a murder case. That's extreme. You all were impressed mightily by that. Surprised. Shocked. These witnesses were highly uncooperative witnesses, and it's important that you take that into consideration as you determine the weight, if any, of the evidence that you heard from them.
>
> And who were those witnesses? Felicia Collins, the star witness for the State, and Antonio Love.
>
> . . . .
>
> Felicia Collins, also in custody, held in jail. Extreme sanction for failure to cooperate. She had been robbed in her own home, beaten with a weapon in front of her own children and her father. You observed her reaction when forced to remember to testify about this horribly traumatic event. How did she react? . . .

Fincher asserts that the trial court erred in overruling his objection to certain comments the prosecutor made during closing argument in response to Fincher's argument. In context, the comments objected to are italicized:

> [PROSECUTOR]: Felicia Collins, Simone Collins, Debra Jarvis, Antonio Love, and Ralph Brashear. The defense would have you believe that they all got together, made up a story, and conspired to frame his client.
>
> Ladies and gentlemen, I know you were paying attention to the demeanor of all of those witnesses, and it was very clear that they were all scared and afraid. And it was pretty clear they didn't want to be here. But they did come and testify, and they did tell you what happened.
>
> And although there are some inconsistencies in what they say, they're all clear on the important stuff, that the Defendant admitted to them that he pulled the trigger; that the Defendant threatened them not to tell.
>
> *And if this was a grand conspiracy, don't you think they would all have their stories straight? Don't you think there wouldn't be any little inconsistencies from here and there?*

They were afraid. And if they wanted to lie and avoid all of this, I guess they could have, but they overcame their fear and testified. And who wouldn't be afraid after what they saw? Simone Collins, Felicia Collins. They saw personally those pictures at the crime scene that you saw. Felicia Collins saw the Defendant pull the trigger. Who wouldn't be afraid? Who wouldn't be scared?

*And yes, Felicia Collins tried to run from this, but she came.*[4] *She gave a statement to the police. She came into this courtroom. She testified truthfully consistent with . . .*

[DEFENSE COUNSEL]: May we approach.

[COURT]: Yes.

(Counsel approached the bench and the following proceedings were had:)

[DEFENSE COUNSEL]: Improper for the prosecutor to vouch for a witness. He said she testified truthfully. That's improper. It's the jury's role and the jury's role alone to determine the credibility of a witness. It's improper argument for a prosecutor to vouch for a witness.

[COURT]: I think it's appropriate. I think it's appropriate argument, and it's a reasonable inference. I think it's appropriate argument. I'm going to overrule the objection.

[DEFENSE COUNSEL]: Thank you, Judge.

(The proceedings returned to open court.)

[PROSECUTOR]: *She testified truthfully. She gave a statement to the police about what she saw, and she went in and gave a deposition to* [Fincher's counsel]. *Told him exactly the same thing she came up here and told you under oath, twice.*

Was she scared? Sure. That fear just adds to her credibility. Now, I want to talk to you about fear. Before I do, think about what all these witnesses have said. It's impossible—unfathomable to believe these young adults all got together a few days after the murder and decided to frame him.

. . . .

And Felicia Collins' testimony to police and her deposition to [Fincher's counsel] and in this witness stand was the same throughout. No differences.

Fincher argues that no evidence was introduced of what Collins told the police after they contacted her; thus, the prosecutor's argument that her police statement was consistent with her trial testimony was based on the prosecutor's personal knowledge and constituted impermissible vouching. Fincher makes the same argument concerning whether her deposition testimony was consistent with portions of her trial testimony.

 "Prosecutors may comment on the evidence and the reasonable inferences to be drawn from the evidence, as long as they do not imply knowledge of facts not before the jury." *State v. Ferguson,* 20 S.W.3d 485, 501 (Mo. banc 2000). "Vouching occurs when a prosecutor implies that he or she has facts establishing the veracity of a state's witness that are not before the jury for their consideration." *State v. Ringo,* 30 S.W.3d 811, 822 (Mo. banc 2000). "A prosecutor has the right to comment on the evidence and the credibility of witnesses from the State's standpoint during closing argument." *State v. McClain,* 824

---

4. Collins testified that she was taken into custody because she attempted to avoid being served with a subpoena to testify in this case.

S.W.2d 103, 106 (Mo.App. E.D.1992). "Whether a prosecutor has exceeded the leeway given him in such comment is a matter within the sound discretion of the trial court." *State v. Bryant,* 741 S.W.2d 797, 799 (Mo.App. E.D.1987).

The trial court ruled that the prosecutor's argument was appropriate and a reasonable inference from the evidence. We agree.

During Collins's direct examination, the State asked Collins whether she was contacted by the police about the shooting and whether she provided a statement. She answered affirmatively. The State then asked: "And did you tell them the truth to the best of your [re]collection as to what happened?" Collins replied, "Yes. Yes."

During Collins's cross-examination, Fincher's counsel questioned Collins about her deposition testimony. He pointed out that Collins testified in her deposition that Fincher was wearing a red zip-up jacket that said either "Shady" or "South Pole" on it, while she testified at trial that it had the word "Shady" on it. He also pointed out that Collins testified in her deposition that she couldn't see the gun from her window. Responding to follow-up questions, Collins testified that "I did see the gun in [Fincher's] hand. I didn't see it in the seat, in the car, at all." On redirect, the State also referred to Collins's deposition regarding whether she saw the gun when asking questions that sought to clarify her deposition testimony. Fincher's counsel objected to the prosecutor's use of the deposition in questioning Collins. The trial court overruled the objection: "The nature of the cross examination that was done by [Fincher's counsel] would allow the prosecutor to bring out the fact that she saw the gun, because that very exact topic was cross examined on. The prosecutor cannot get into other consistencies

that exist beyond those cross examined parts."

Based on this testimonial evidence that came in at trial, the prosecutor did not refer to facts not in evidence when he argued in the State's closing argument that Collins's testimony was truthful. In her trial testimony, Collins confirmed that she told the truth when she was interviewed by the police about the shooting. Although Fincher's counsel attempted to point out inconsistencies between Collins's deposition and trial testimony on cross-examination, the State's redirect examination allowed Collins to clarify the consistencies in her sworn statements. The trial court did not abuse its discretion in permitting the prosecutor's closing argument as his comments fell within the permitted boundaries of closing argument.

Point II is denied.

### Conclusion

The trial court's judgment is affirmed.

GARY D. WITT, Presiding Judge, and JOSEPH M. ELLIS, Judge, concur.