

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | ) WD75596 |
| v. | ) |
| | ) OPINION FILED: |
| | ) April 8, 2014 |
| DEANDRE J. KEY, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Charles H. McKenzie, Judge**

**Before Division One:** Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer and Karen King Mitchell, Judges

Deandre J. Key appeals his convictions and sentences, following a jury trial, for unlawful use of a weapon (Count III), under section 571.030, and armed criminal action (Count IV), under section 571.015.[1] Key first claims that there is insufficient evidence to support his convictions. In support of his insufficiency claim, Key argues that section 571.030.1(9) was enacted to criminalize the act of shooting a firearm *from* a motor vehicle, not *at* a motor vehicle. Therefore, he argues that because the State failed to present any evidence that he shot a firearm from a motor vehicle and, instead, presented evidence that he shot a firearm at a vehicle from the front yard of a townhouse complex, the evidence was insufficient to support his convictions under

---

[1] All statutory references are to the Revised Missouri Statutes 2000, as updated through the 2011 Cumulative Supplement, unless otherwise noted.

section 571.030.1(9) and the trial court erred in overruling his motion for judgment of acquittal. Key also claims that the trial court plainly erred in allowing testimony related to uncharged crimes. Finding no error, we affirm.

**Factual and Procedural Background**[2]

On the afternoon of April 28, 2011, Carolyn Hill and her husband, James Mack, were sitting in their parked vehicle, a 1991 Ford Explorer, in front of their townhouse in Kansas City, Missouri. While in the vehicle, both Hill and Mack observed Key talking to Hill's brother at the front door of their townhouse. Hill and Mack had recently been introduced to Key and were familiar with him, as they had seen him hanging around the townhouse complex in the past.

Immediately after talking to Hill's brother, Key approached Hill and Mack's vehicle and told them that someone was going to pay him the $20 that Hill's brother owed him. Key first approached Mack on the driver's side of the vehicle, and then walked over to the passenger side where Hill was sitting. When Key approached the passenger side of the vehicle, Hill got out, looked Key in the face, and said, "Are you serious, are you really going to come to me about $20?" After a brief verbal altercation with Hill, Key walked into the front yard of the townhouse, turned, and started shooting at Hill and Mack's vehicle. Mack was still in the vehicle when the shooting began and Hill was outside of the vehicle, but was shielding herself between her vehicle and a van parked next to it. After firing multiple shots, Key ran from the scene. Hill was not injured and Mack suffered a minor injury to the back of his neck from broken glass.[3]

---

[2] We view the facts in the light most favorable to the verdict. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009).

[3] Mack testified that he had leaned over to turn down the radio just before the shooting began. He believes this saved his life because the bullet that shattered the window and caused glass to fall onto his neck entered the vehicle above the back of his head.

The police located eleven shell casings from a nine-millimeter handgun at the scene and observed that eight bullets entered and two bullets exited the vehicle. The police spoke to Hill and Mack separately at the scene, at which time they both provided police with a similar physical description of the person who shot at their vehicle and said that they knew the shooter as "Dre." Hill and Mack also accompanied the police to the station shortly after the incident to make a statement. While at the station, they both identified the same suspect in a photo spread.[4] At trial, Hill testified that she saw Key shoot at the vehicle and identified him as the shooter. Mack testified that he did not see Key shooting at the vehicle, but he identified Key as the person who approached the vehicle just before the shooting began.

The day after the shooting, while on a routine patrol in an area about fifteen blocks from the townhouse complex, Officer Jeremy Buske and his partner observed a reddish-orange Cavalier driving in the middle of the street toward their police car. A male, later identified as Key, was driving the Cavalier, and a female was in the passenger seat. After noticing that the Cavalier had a temporary tag falling out of the window and observing it roll through a stop sign, Officer Buske and his partner turned around to follow the vehicle. They then observed the vehicle pull over in front of a repair shop, where it stopped briefly before quickly driving away. The officers continued to follow the vehicle a short distance until it parked on the street in front of a house, where Key and the female occupant walked onto the porch; they did not enter the house.

---

[4] The photo-spread identifications were admitted into evidence as Exhibits 21 (Hill's identification) and 22 (Mack's identification). However, from the transcript, all that is revealed is that both Hill and Mack circled the picture of suspect number five. Given the fact that Hill and Mack both identified Key as someone they knew and told police it was Key who shot at their vehicle, we presume that it was Key's photograph that they chose in the photo spread. Exhibits 21 and 22, however, are not part of the record on appeal, nor does the transcript reflect that the photograph identified was a picture of Key. This does not affect the outcome of the case as Key does not claim that the evidence was insufficient to demonstrate that he was the person who shot the firearm on the day of the incident.

As the officers drove toward the house and the parked Cavalier, Officer Buske noticed a man, Jose Oporta Rosales, walking at a fast pace toward him from the direction of the repair shop, which was about fifty feet from where the Cavalier was parked. Rosales, who worked at the repair shop, told Officer Buske that the male driver of the Cavalier disposed of a gun in front of the shop. Rosales testified that, when he first saw that the driver of the Cavalier had a gun, he thought the driver might shoot him, but the driver just threw the gun onto the ground and drove off. After talking to Rosales, the officers continued to the location of the Cavalier in order to conduct a vehicle check.[5] As they approached the vehicle, Officer Buske told Key and the female occupant to wait on the porch; Key immediately ran away from the house. Officer Buske apprehended Key after a short pursuit. The gun that Key disposed of at the repair shop, a nine-millimeter Lorcin semi-automatic handgun, was a match to all eleven shell casings recovered at the scene of the shooting.

Following a jury trial, Key was convicted of first-degree assault (Count I), armed criminal action (Counts II and IV), and unlawful use of a weapon (Count III).[6] Key was sentenced by the court to a total of fifteen years in prison.[7] This appeal follows.

**Analysis**

I.  **Section 571.030.1(9) is not ambiguous and the trial court did not err in overruling Key's motion for judgment of acquittal.[8]**

In his first point, Key claims that the trial court erred in overruling his motion for judgment of acquittal, entering judgments of conviction, and sentencing him for unlawful use of

---

[5] Officer Buske testified that a vehicle check "is basically a violation on the vehicle for traffic and all the violations we saw."

[6] In this appeal, Key does not challenge his convictions and sentences for first-degree assault (Count I) or armed criminal action (Count II).

[7] Key was sentenced to concurrent terms of fifteen years for first-degree assault, three years for each count of armed criminal action, and fifteen years for unlawful use of a weapon.

[8] A substantially similar claim was raised in WD76160 (*State v. Griddine*). Due to the similarity of the cases, a significant portion of the analysis is the same.

4

a weapon (Count III) and armed criminal action (Count IV). Count III of the indictment charged Key, under section 571.030.1(9), with the class B felony of knowingly shooting "a firearm *at* a motor vehicle[,] a 1991 Ford Explorer." (Emphasis added.) Count IV charged Key with armed criminal action in that he "committed the felony of unlawful use of a weapon charged in Count III." Key claims that section 571.030.1(9) is ambiguous, must be construed against the State, and should be interpreted as criminalizing the act of shooting a firearm *from* a motor vehicle, not shooting a firearm *at* a motor vehicle. Key argues that the State did not present any evidence that he shot a firearm from a motor vehicle. Therefore, Key's insufficiency claim succeeds only if we agree that section 571.030.1(9) prohibits the act of shooting a firearm from a motor vehicle, but not the act of shooting a firearm at a motor vehicle. Because we disagree with Key's suggested interpretation of section 571.030.1(9) and he has not challenged the sufficiency of the evidence demonstrating that he shot a firearm at a motor vehicle, his argument fails.

Statutory interpretation is a question of law subject to de novo review. *State v. Barraza*, 238 S.W.3d 187, 192 (Mo. App. W.D. 2007). "In interpreting a statute, we are to ascertain the intent of the legislature from the language used and give effect to that intent, if possible." *State v. Lewis*, 188 S.W.3d 483, 486 (Mo. App. W.D. 2006). "In ascertaining the intent of the legislature, we are to give the language used its plain and ordinary meaning." *Id.* at 486-87. When "'statutory language is unambiguous, we need not resort to statutory construction and must give effect to the statute as written.'" *Barraza*, 238 S.W.3d at 192 (quoting *State v. Graham*, 149 S.W.3d 465, 467 (Mo. App. E.D. 2004)). "In order to understand the intent of the [l]egislature, it is helpful to review how the language in the statute has been interpreted in the past." *Bunker v. Rural Elec. Coop.*, 46 S.W.3d 641, 644 (Mo. App. W.D. 2001).

It is only "[w]hen the legislative intent cannot be ascertained from the language of the statute, by giving it its plain and ordinary meaning, [that] the statute is considered ambiguous" and the rules of statutory construction are applied. *State v. Brushwood*, 171 S.W.3d 143, 147 (Mo. App. W.D. 2005). "A statute is ambiguous if the language is subject to more than one reasonable interpretation." *Barraza*, 238 S.W.3d at 192; *see also Lewis*, 188 S.W.3d at 487 (noting that to determine ambiguity, this Court "'looks to whether the language is plain and clear to a person of ordinary intelligence'" (quoting *State ex rel. Nixon v. Premium Standard Farms, Inc.*, 100 S.W.3d 157, 161 (Mo. App. W.D. 2003))). "Under the rule of lenity, an ambiguity in a penal statute will be construed against the government or party seeking to exact statutory penalties and in favor of persons on whom such penalties are sought to be imposed." *State v. Graham*, 204 S.W.3d 655, 656 (Mo. banc 2006).

Section 571.030.1(9) provides that a person unlawfully uses a weapon if he knowingly "[d]ischarges or shoots a firearm at or from a motor vehicle, as defined in section 301.010, discharges or shoots a firearm at any person, or at any other motor vehicle, or at any building or habitable structure, unless the person was lawfully acting in self-defense."

Key argues that section 571.030.1(9) has two possible interpretations. First, he argues that it could be interpreted as creating three two-act offenses: (1) "shooting at a motor vehicle and at a person"; (2) "shooting at a motor vehicle and also shooting at any other motor vehicle"; or (3) "shooting at a motor vehicle and shooting at a building." Second, Key argues that section 571.030.1(9) could be interpreted as prohibiting "shooting from a motor vehicle at persons, or other motor vehicles, or buildings." Because there are two possible interpretations, Key claims that the statute is ambiguous and advocates that we adopt the interpretation more favorable to him: the second interpretation. Key asserts that the context of the statute itself as well as the

6

historical context surrounding its enactment in the mid-1990s (when the issue of drive-by shootings was becoming a significant concern) also indicate that section 571.030.1(9) was intended to criminalize shooting firearms from motor vehicles at people, other motor vehicles, or buildings. However, as Key recognizes, an argument nearly identical to his was already addressed and rejected by this Court in *State v. Barraza*. Key urges us to reexamine section 571.030.1(9) and reconsider the holding in *Barraza*. We are not persuaded that the statute requires reexamination.

The defendant in *Barraza* also claimed that section 571.030.1(9) had two possible meanings. 238 S.W.3d at 192. Barraza argued that the statute could be interpreted to prohibit either: (1) shooting from a motor vehicle at a person, another vehicle, or a building; or, (2) a series of "acts including shooting 'at or from' a motor vehicle, or 'at' a person, other motor vehicle, or a building." *Id.* Barraza argued that, because the statute was ambiguous, this Court should interpret section 571.030.1(9) as criminalizing shooting a firearm from a motor vehicle, not at a motor vehicle. *Id.* In rejecting Barraza's argument, we noted that "[t]he plain and ordinary meaning of the statute prohibits shooting at a motor vehicle, at any person, or at any building *or* shooting from a motor vehicle at any person, or at any other motor vehicle, or at any building." *Id.* We noted further that Barraza's assertion that the statute was ambiguous because it could be read "to prohibit shooting at a motor vehicle or 'at any other motor vehicle' . . . conflate[d] redundancy with ambiguity." *Id.* Although we noted that the statute was "perhaps not a model of draftsmanship," we found that the language in section 571.030.1(9) was not ambiguous, and Barraza's conviction, based upon his act of shooting a firearm "from the street at a vehicle," was affirmed. *Id.*

"The doctrine of *stare decisis*—to adhere to decided cases—promotes stability in the law by encouraging courts to adhere to precedents." *Med. Shoppe Int'l, Inc. v. Dir. of Revenue*, 156 S.W.3d 333, 334-35 (Mo. banc 2005). And, while adherence to precedent "is not absolute, and the passage of time and the experience of enforcing a purportedly incorrect precedent may demonstrate a compelling case for changing course[,]" *id.* at 335, this is not such a case. Moreover, "[r]ules of statutory construction should not be used to create an ambiguity where none exists." *Barraza*, 238 S.W.3d at 192. Additionally, although the Missouri legislature has amended section 571.030 since *Barraza* was decided, none of those amendments altered the language in the subsection at issue in this appeal.

Thus, because the language in section 571.030.1(9) remains the same as when it was interpreted in *Barraza*, a decision in which we rejected an argument nearly identical to Key's, we are not persuaded that the statute requires reexamination. *See Bunker*, 46 S.W.3d at 645 (noting that "'[w]here the [l]egislature, after a statute has received a settled judicial construction, reenacts or carries forward without change, or reincorporates the exact language theretofore construed, it is to be presumed that it knew of and adopted the judicial construction previously given to the statute'" (quoting *Int'l Bus. Machs. Corp. v. Dir. of Revenue*, 958 S.W.2d 554, 559-60 (Mo. banc 1997) (Dowd, J., concurring))). Section 571.030.1(9), as previously interpreted by this Court, criminalizes the act of shooting a firearm *at* a motor vehicle. Here, Key argued only that the evidence was insufficient to support a finding that he shot a firearm *from* a motor vehicle; therefore, we need not review Key's sufficiency claim.

Point I is denied.

**II.** **The trial court did not plainly err in allowing testimony regarding Rosales's belief that Key was going to shoot him before he disposed of the gun at the repair shop.**

In his second point, Key claims that the trial court plainly erred in allowing testimony about Rosales's belief that Key was going to shoot him before Key threw the gun out of the car window at the repair shop. Key asserts that this evidence was not legally relevant to the charges against him and its admission was prejudicial. Although Key alleges that the admission of evidence of uncharged crimes was prejudicial, he concedes that no objection was raised at trial and requests plain error review, thereby acknowledging that, to succeed on this claim, he must demonstrate manifest injustice or a miscarriage of justice. Rule 30.20.[9]

"Issues that were not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error." *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). Plain error review is a two-step process. *Id.* First, we must determine "whether the claim of error 'facially establishes substantial grounds for believing that "manifest injustice or miscarriage of justice has resulted."'" *Id.* (quoting *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995)). Not every prejudicial error, however, constitutes plain error, as plain errors are evident, obvious, and clear. *Id.*; *see also State v. Warren*, 304 S.W.3d 796, 799 (Mo. App. W.D. 2010). If the claim of plain error facially establishes grounds for believing that manifest injustice or a miscarriage of justice resulted, we may elect to exercise our discretion and proceed "'to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected.'" *Warren*, 304 S.W.3d at 799 (quoting *State v. Brink*, 218 S.W.3d 440, 448 (Mo. App. W.D. 2006)). In cases where "the evidence of a defendant's guilt is overwhelming, no

---

[9] All rule references are to the Missouri Supreme Court Rules (2013), unless otherwise noted.

manifest injustice or miscarriage of justice results from the refusal to allow plain error review." *State v. Adams*, 350 S.W.3d 864, 867 (Mo. App. E.D. 2011).

Key claims that the trial court plainly erred in allowing testimony about Rosales's belief that Key was going to shoot him before Key threw the gun out of the car window at the repair shop. "Generally, the State cannot use a defendant's bad character to prove bad conduct in conformity with that character." *State v. Slagle*, 206 S.W.3d 404, 410 (Mo. App. W.D. 2006). "Other uncharged misconduct is generally inadmissible to prove the defendant's propensity to commit the current charged crime." *Id.* This is because "[e]vidence of uncharged crimes, when not properly related to the cause on trial, violates a defendant's right to be tried for the offense for which he is indicted." *State v. Burns*, 978 S.W.2d 759, 760 (Mo. banc 1998). However,

> [e]vidence of prior misconduct of the defendant, although not admissible to show propensity, is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect.

*Id.* at 761. In other words, evidence of uncharged prior misconduct may be "admissible to provide the jury a complete picture of the circumstances surrounding the charged crime." *Slagle*, 206 S.W.3d at 410. Additionally, "[v]ague references to other uncharged crimes are insufficient to warrant reversal for trying a defendant for uncharged crimes." *Id.* "The defendant's association with other crimes must be clear and definite to run afoul of the general rule of inadmissibility." *Id.*

Here, the evidence that Key alleges was admitted in error related to Rosales's *belief* that the defendant was going to shoot him and it was not specifically sought by the State in order to show that Key had, in fact, attempted to shoot Rosales. Therefore, it is not clear that this evidence constitutes an uncharged crime or prior misconduct. However, even if it did, it was not

10

directly sought by the State and was offered by Officer Buske and Rosales in response to general questions about the events that occurred on April 29, 2011, prior to Key's arrest. Moreover, Key does not clearly allege how the testimony of Rosales's mistaken belief as to Key's intent when he pulled over in front of the repair shop would likely lead to a manifest injustice or a miscarriage of justice. Therefore, Key's claim of error does not meet the threshold requirement of facially establishing substantial grounds for believing that a manifest injustice or a miscarriage of justice resulted from the alleged error; thus, we decline to reach Key's claim of plain error.

Point II is denied.

## Conclusion

Section 571.030.1(9), as previously interpreted by this Court, criminalizes the act of shooting a firearm *at* a motor vehicle. Further, Key's claim of trial court error in admitting evidence of Rosales's belief that Key was going to shoot him before he disposed of the gun does not facially establish substantial grounds for believing that a manifest injustice or miscarriage of justice resulted from the alleged error and we therefore decline to engage in plain error review. The judgment is affirmed.

_____
Karen King Mitchell, Judge

Cynthia L. Martin, Presiding Judge,
and Mark D. Pfeiffer, Judge, concur.

11