

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD77201 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | April 28, 2015 |
| JEFFREY DEAN MORELAND, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Cass County, Missouri**
**The Honorable R. Michael Wagner, Judge**

**Before Division III:** Mark D. Pfeiffer, Presiding Judge, and
Gary D. Witt and Anthony Rex Gabbert, Judges

Jeffrey D. Moreland ("Moreland") appeals the Judgment of the Circuit Court of Cass County, Missouri ("trial court"), finding him guilty, following a jury trial, of murder in the first degree and armed criminal action. Moreland asserts that the trial court erred in admitting testimony that he was "a person of interest" in another case and in admitting evidence about other guns he owned. We affirm.

## Facts and Procedural History[1]

J.R. ("Husband") and his wife ("Victim")[2] lived in Harrisonville, Missouri, with their son. On November 5, 2008, when Husband came home from work at about 5:30, he found

---

[1] In an appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Key*, 437 S.W.3d 264, 265 n.2 (Mo. App. W.D. 2014).

Victim face down in the bathtub in bloody water. She was not breathing. Husband grabbed Victim and turned her over, and then he called 911.

Officers from the Harrisonville Police Department responded and found a nude female in her early thirties, who appeared to be deceased, lying in a twisted fashion in the bathtub in six to eight inches of pinkish tinged water. The water was running; there were large blood spots in the bathtub and blood above Victim's head in the curvature of the bathtub. Only the hot water had been turned on, but only cold water had been running out; so the officers concluded that the hot water had been running for awhile. There was no towel or clothing in the bathroom. There was a locked zip tie that had been cut that was in close proximity to the bathtub, and outside the bathroom in the hallway area was another engaged or locked zip tie that had been cut. In the master bedroom, all of the bedding had been taken off the bed and laid on the floor. No fitted or flat sheet was found with the bedding. A used roll of duct tape was under the footboard of the bed. A palm print was found on the edge of the sink in the master bathroom. Other fingerprints were collected throughout the house. An R-P Luger 9mm shell casing was found underneath Victim's body. Also under the body was a copper jacket fragment from a bullet. Partial palm prints were found near the bottom of the bathtub rim on the right side. There was also a clump of hair on the wall of the bathtub near Victim. There was apparent blood in the bathtub, on the rim of the bathtub, on the left side of the toilet, on the threshold of the bathroom door, and on the exterior side of the bathroom door.

An autopsy was performed on Victim's body on November 6. Bullet fragments were recovered from Victim's left leg. Victim had been shot in the back of the head. The entry wound was between and behind the left ear and the back midline of the head, and the exit wound

---

[2] Pursuant to section 566.226, RSMo Cum. Supp. 2013, we do not refer to Victim or her family by name to protect their identity.

was on the left cheek. The bullet caused extensive damage through the bones and the brain along the left side of the head. The bullet caused a reentry wound in Victim's left thigh, but there was no exit wound associated with the reentry wound. Victim also had an abrasion on her right breast; bruises on the palm, right thumb, and right forearm; two bruises on the left forearm; and bruises on her legs and buttocks. There was a white creamy fluid in Victim's vaginal cavity. Based on the location of the wounds, it appeared that Victim was shot in the back of the head while in the fetal position, and the bullet exited her cheek and entered her left thigh. The gunshot wound was fatal. Blood samples, hairs, vaginal swabs and smears, and swabs and smears of other body parts were taken during Victim's autopsy.

The Kansas City Police Department Crime Laboratory examined the evidence from Victim's autopsy and observed sperm within the vaginal smear. DNA testing revealed the male portion of the DNA was a mixture of two individuals, less DNA from Husband and more DNA from an unknown individual, which was consistent with the unknown male having had sexual intercourse more recently with Victim than Husband. The DNA from the zip ties was consistent with that of Victim and the unknown male. The unknown male's genetic profile also matched the partial profile from the duct tape. The police collected DNA samples from sixty-one people, but none of them matched the genetic profile of the unknown male.

Fourteen to eighteen months after Victim's death, leads were going cold. In June 2011, Detective Blank with the Kansas City, Missouri, Police Department and another detective went to Harrisonville to talk to Moreland, "a person of interest" in a different case Detective Blank was working on in Kansas City, and to obtain a DNA sample from Moreland. They told Moreland that they needed a DNA sample, but Moreland said he was busy that day. Thereafter,

3

Moreland obtained a sample of his daughter's fiancé's blood from a finger prick and a cheek swab with a Q-tip and placed them in a prescription container.

Moreland contacted a sergeant with the Grandview, Missouri, Police Department, and asked him to meet at a QuikTrip. Moreland had worked with the sergeant when Moreland was a patrolman on the Grandview police force. They parked next to each other, and Moreland said, "Watch this." He swabbed the inside of his cheek, put the swab below the officer's line of sight, and held up a plastic pill bottle with the swab inside. Moreland then pricked his finger, wiped it with a cotton swab, put it below the officer's line of sight, and held up a pill bottle with swabs inside. He gave the pill bottles to the officer and told him that he could give the bottles to the Kansas City Police Department when he was contacted.

After this meeting, Moreland called Detective Blank and told him that he had provided a DNA sample to a Grandview police sergeant. Detective Blank and another detective drove to Grandview and talked with the sergeant, but told him that they needed to get a sample from Moreland directly. A few days later, Moreland called Detective Blank and told him he was going to Iowa to be with his sick father and that he would get with the detective about providing a DNA sample when he returned.

Thereafter, Detective Blank retrieved the bottle from the Grandview Police Department so it could be tested by the Kansas City, Missouri, Police Department Crime Laboratory. During the detective's investigation, he talked to Moreland's ex-wife, and she told him that the DNA that had been given to the Grandview Police Department had been taken from her daughter's fiancé. A DNA sample was taken from the fiancé, and subsequent testing indicated that it matched the DNA in the samples Moreland had given the Grandview police sergeant.

Detective Blank and other officers located Moreland in Iowa and went there to obtain a DNA sample from him. Moreland was in the hospital, after apparently attempting suicide. The officers took possession of a Glock 45 semi-automatic handgun that had a magazine with twelve unspent rounds. They arrested Moreland, obtained a search warrant, and took a DNA sample from him at the jail. When he was booked, his fingerprints were taken. The officers returned to Iowa and obtained a search warrant to search the residence of Moreland's father. The officers seized a Browning 9mm semi-automatic handgun. Moreland had previously owned a 9mm Smith and Wesson, which was the kind of firearm that fired the bullet fragment recovered from the scene. Moreland's father brought out a small cardboard box containing four or five handguns, none of which were 9mm.

Officers searched Moreland's house in Harrisonville and discovered a bag of zip ties in the basement that were essentially indistinguishable from the ones found at the crime scene. An examination of the roll of duct tape found at the foot of Victim's bed revealed a latent print on the adhesive side of the duct tape, which was identified as Moreland's right index finger.

A forensic specialist in the Kansas City Police Department Crime Laboratory performed a DNA analysis on items of evidence that were recovered in the investigation of Victim's death.

DNA testing of the vaginal swab revealed that the profile of the unknown male's DNA and Moreland's DNA matched. The random match probability was one in one quadrillion unrelated individuals. Moreland was the major source of semen from Victim's vaginal swab, which would be consistent with him having had sexual intercourse with Victim more recently than Husband.

On the zip tie found in the hallway, the major profile was consistent with Victim, and the minor profile was consistent with the unknown male. Moreland was included as a possible

contributor to the partial minor profile. The uniqueness of that minor profile was one in 570 unrelated individuals. On an interior loop of the zip tie that was found in the bathroom, a partially discerned profile matched Victim and the other profile matched Moreland. The frequency of potential contributors to that mixture of DNA was one in 100 million unrelated individuals. On the exterior loop of that same zip tie, one profile matched Victim and the other profile matched Moreland, and the expected frequency of contributors to that mixture was one in 47 million unrelated individuals.

Moreland was also a possible contributor to the DNA found on the duct tape, and the random match probability or the frequency or uniqueness of this profile was one in four unrelated individuals. Moreland was a possible contributor to the DNA profile developed from the DNA on the fingerprint swab, and the expected frequency of contributors was one in 350 million unrelated individuals.

The State charged Moreland with murder in the first degree and armed criminal action for the shooting death of Victim. The jury found Moreland guilty as charged. As punishment for murder in the first degree, the jury assessed and declared the punishment at imprisonment for life without eligibility for probation or parole. After hearing evidence in the penalty phase, the jury assessed and declared the punishment for armed criminal action at fifty years. Thereafter, the trial court sentenced Moreland to life imprisonment without probation or parole for first-degree murder and to fifty years imprisonment for armed criminal action, with the sentences to run consecutively. The trial court denied Moreland's motion for new trial.

Moreland appeals.

## Standard of Review

Under Rule 30.20, "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "The 'plain error' rule should be used sparingly and is limited to those cases where there is a strong, clear demonstration of manifest injustice or a miscarriage of justice." *State v. Fincher*, 359 S.W.3d 549, 553 (Mo. App. W.D. 2012) (internal quotation omitted). "Plain error review is a two-step process. *Id.* "First, we determine whether or not the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id.* (internal quotation omitted). "Error is plain if it is evident, obvious, and clear." *Id.* at 553-54. "If we do not find plain error on the face of the claim, we should decline to exercise our discretion to review the claimed error under Rule 30.20." *Id.* at 554. "If we do find plain error on the face of the claim, we have the discretion to proceed to the second step to consider whether a manifest injustice or a miscarriage of justice will result if the error is left uncorrected." *Id.*

## Point I

In Moreland's first point, he asserts that the trial court erred in admitting evidence that he was "a person of interest" in another case.[3] He contends that this evidence violated his right to due process and to be tried only for the crime with which he was charged.

---

[3] Moreland also asserts that the trial court erred in overruling defense counsel's objections to the State's opening statement in which he was referred to as "a person of interest" in another case. "This argument fails because the point of an opening statement is to explain to the jury the evidence that the party intends to introduce. There is no error in referencing evidence in an opening statement, therefore, if the party has a good faith belief that the evidence is admissible." *State v. McFadden*, 391 S.W.3d 408, 430 (Mo. banc 2013). Prior to trial, the State filed a motion *in limine* to allow the admission of evidence that the detective contacted Moreland because he was a suspect or person of interest in a Kansas City investigation the detective was conducting, and that a Cass County warrant was issued for Moreland's arrest, prompting officers to seek Moreland's arrest in Iowa. After a hearing, the trial court granted the State's request but cautioned that there may not be any mention of any other crime. Based upon this ruling, the State would have had a good faith basis for concluding that the challenged evidence would be admissible.

Initially, we note that although defense counsel objected, he did not object on the grounds that Moreland now asserts on appeal. Detective Blank testified that in June 2011, he was working as a detective for the Kansas City, Missouri, Police Department:

Q [By Prosecutor]: Did your work cause you to come to Harrisonville?

A [By Det. Blank]: Yes.

Q: And why was that?

A: We had a person of interest by the name of Jeff Moreland come up in a case I was working in Kansas City.

Q: And what was your reason for coming down to Harrisonville?

A: I needed to talk to Mr. Moreland and obtain a DNA sample from him for my case.

At that point, defense counsel asked to approach the bench:

Your Honor, I am renewing my objection in relation to any testimony that this officer *might give* based upon other crimes and other conduct. This goes to an event that is outside what this is, and I think that it can only serve to prejudice the jury for them to hear any evidence or any testimony about *this other event that Detective Blank was investigating*.

(Emphasis added.) The prosecutor responded that "the information that he has just provided is actually the extent of which I have instructed that he is allowed to refer to and that is based upon the Court's ruling." The trial court noted defense counsel's objection and instructed that "there will be no further testimony regarding that issue." Defense counsel did not request any further relief.

"To properly preserve an issue for an appeal, a timely objection must be made during trial." *State v. McFadden*, 369 S.W.3d 727, 740 (Mo. banc 2012) (internal quotation omitted). "The objection at trial must be specific, and on appeal, the same grounds must be relied upon." *Id.* The specific objection Moreland made at trial was "to any testimony that this officer might

give based upon other crimes and other conduct." He did not object to the detective's *past* testimony that Moreland was "a person of interest in another investigation." Instead, he objected to any *subsequent* testimony that the detective "might give" about "this other event that Detective Blank was investigating." Because his challenge on appeal is not on the same grounds as his objection at trial, the issue is not properly preserved;[4] and Moreland's challenge to the admission of this evidence can only be reviewed for plain error. Rule 30.20.

### Analysis

"Generally, the State cannot use a defendant's bad character to prove bad conduct in conformity with that character." *State v. Key*, 437 S.W.3d 264, 270 (Mo. App. W.D. 2014) (internal quotation omitted). "Other uncharged misconduct is generally inadmissible to prove the defendant's propensity to commit the current charged crime." *Id.* (internal quotation omitted). "This is because '[e]vidence of uncharged crimes, when not properly related to the cause on trial, violates a defendant's right to be tried for the offense for which he is indicted.'" *Id.* (quoting *State v. Burns*, 978 S.W.2d 759, 760 (Mo. banc 1998)). However, "evidence of uncharged prior misconduct may be admissible to provide the jury a complete picture of the circumstances surrounding the charged crime." *Id.* (internal quotation omitted). Furthermore, "[v]ague references to other uncharged crimes are insufficient to warrant reversal for trying a defendant for uncharged crimes." *Id.* (internal quotation omitted). "The defendant's association with other crimes must be clear and definite to run afoul of the general rule of inadmissibility." *Id.* (internal quotation omitted). "The admission of evidence only violates the general rule as to

---

[4] Further, to the extent that Moreland claims that his belated objection was intended to include "person of interest" testimony that had already been given, the objection was untimely. "[W]here an objection is made after the testimony has already been given, the objection comes too late." *State v. Mahoney*, 70 S.W.3d 601, 605 (Mo. App. S.D. 2002) (internal quotation omitted). Likewise, Moreland did not seek to strike the "already given" testimony by the detective. In sum, under any lens of review of the colloquy at trial, the error claimed on appeal was not properly preserved.

uncharged crimes evidence if it shows that the defendant has committed, been accused of, [or] been convicted of or definitely associated with another crime or crimes." *State v. Harris*, 156 S.W.3d 817, 824 (Mo. App. W.D. 2005). *See also State v. Henderson*, 826 S.W.2d 371, 375 (Mo. App. E.D. 1992) (evidence of arrest warrant for an unrelated offense is not prejudicial where details of the warrant are not admitted); *State v. Sanders*, 761 S.W.2d 191, 192 (Mo. App. E.D. 1988) (stating that where there were "outstanding warrants" for the defendant's arrest, "[n]ot mentioning the type of prior offenses underlying the warrants minimizes any potential prejudice").

Moreland challenges the admission of Detective Blank's testimony that Moreland was "a person of interest" in a different case. A "person of interest" is "police jargon" for "[s]omeone who is the subject of a police investigation or wanted for questioning but who has not been identified by investigators as being suspected of committing the crime itself." BLACK'S LAW DICTIONARY 1324 (10th ed. 2014). Here, Detective Blank's challenged testimony related to why a Kansas City detective contacted Moreland and became involved in Victim's case fourteen to eighteen months after her death. It was offered by Detective Blank in response to a general question about why his work as a detective for the Kansas City Police Department in June 2011 caused him to come to Harrisonville. The detective's response was not made to indicate Moreland had committed prior bad acts or uncharged crimes; it was merely to explain that the detective wanted to talk to Moreland and obtain a DNA sample from him for a case he was working on in Kansas City. *See, e.g., State v. McMilian*, 295 S.W.3d 537, 540 (Mo. App. W.D. 2009) ("In cases where a 'hit' or match is made, the State needs to be able to explain how a particular individual became a suspect, especially where, as here, a considerable period of time has passed since the offense."). Detective Blank's testimony did not constitute evidence of

uncharged misconduct in that the challenged remark was vague, indefinite, and did not refer to a specific crime or specific conduct. Detective Blank did not state that Moreland was a suspect or what kind of case he was working in Kansas City. Instead, he was merely explaining why a detective from the KCPD was seeking DNA evidence in Harrisonville—DNA evidence that Moreland later tried to falsify. Therefore, the detective's testimony did not constitute evidence of an uncharged crime or prior misconduct.

There was no evidence linking Moreland to other crimes he may or may not have committed. The detective's mere reference to Moreland as a "person of interest," without more, is too vague to prejudice the jury against Moreland. Furthermore, in this case, overwhelming DNA evidence was presented to support the jury's guilty verdict. Moreland's claim of error does not meet the threshold requirement of facially establishing substantial grounds for believing that a manifest injustice or a miscarriage of justice resulted from the alleged error; therefore, we decline plain error review.

Point I is denied.

## Point II

In Moreland's second point, he asserts that the trial court plainly erred in admitting evidence that he owned a large number of firearms unrelated to the charges. He contends that any probative value of the evidence was outweighed by its prejudicial impact since evidence of other weapons is particularly prejudicial. Because Moreland did not object to the testimony about the guns, our review is for plain error.

An officer assigned to the Investigation Division of the Harrisonville Police Department testified that he collected from Iowa police a Glock 45 semi-automatic handgun seized from Moreland's hotel room. The officer also testified that he and another officer returned to Iowa to

11

the residence of Moreland's father. Moreland's father brought out a small cardboard box containing four or five handguns. The officers seized a Browning 9 mm semi-automatic handgun and two empty magazines that the father had in safekeeping for Moreland. The Browning was submitted to the Kansas City Crime Laboratory for comparison testing to the bullet fragment shell casing recovered from the scene. None of the firearms submitted for testing fired the ammunition components seized from the crime scene. Moreland argues that the trial court should have excluded evidence of other guns because the jury likely assumed that Moreland was more likely the perpetrator of a killing with a handgun since he was a person who owned a number of handguns.

The State contends that Moreland's strategic decision not to object to the admission of the gun evidence constituted a waiver of appellate review for plain error. We agree.

Plain error review applies when no objection is made due to inadvertence or negligence. *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009). "Plain error review is waived when counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence." *Id.* (internal quotation omitted). Plain error review does not apply when a party does not object to evidence an opposing party is attempting to introduce for a trial strategy reason. *Id.*

Moreland's counsel cross-examined one of the officers who went to Iowa about the guns:

Q: Now, you said that you went and obtained various guns from Mr. Moreland's father's residence; is that right?

A: We collected one gun from Mr. Moreland's father.

Q: All right. And you said you collected some other guns as well or observed some other guns?

A: Observed some other guns when we were at his father's residence.

Q: All right. So you collected one, but you observed a number of them that were there; is that right?

A: That's correct. That's correct.

Q: And that was after you had asked him about being able to retrieve guns that were his son's; is that correct?

A: That's correct.

Q: And do you have any idea how many guns there were total?

A: I believe there were, like I said, four or five, maybe, in the box total.

Defense counsel also questioned the officer and an Iowa police officer about the .45 caliber handgun that was recovered at Moreland's hotel in Iowa. Moreland's counsel cross-examined the supervisor of the Kansas City Police Department Crime Laboratory's Firearm Section regarding her opinion that a 9mm Smith and Wesson handgun was most likely the type of firearm used in this case:

Q: . . . Just so I understand, you are indicating that the Smith and Wesson 9mm is the most likely handgun. Could there be other handguns—

A: Yes, sir.

Q: —that would fall into that?

A: There may be a couple of other ones.

Q: And what would those be?

A: It would be, it is called, an IMI or Israeli Military Industries and there is another firearm that is called an FN Herstal, which is a European-made firearm.

Q: All right. And obviously, you didn't have any of those weapons to test in this particular case.

A: That's correct.

Q: And just so I understand correctly, you were never submitted a weapon that came back as the weapon that would have been used in this case?

13

A:  Correct.

In closing, defense counsel argued, in pertinent part:

> State has made a lot of discussion about weapons and what weapons were recovered, what weapons were tested, what weapons weren't recovered.  They don't have a weapon in this case.  They don't.  If they did, it would be here but they don't.

Moreland cannot argue plain error on appeal because the trial record indicates that he relied upon the evidence he challenges in arguing that the State did not prove beyond a reasonable doubt that he was the shooter because the State could not find the murder weapon among his guns.

"A trial court does not plainly err when it fails to *sua sponte* prohibit the introduction of objectionable evidence when the totality of the surrounding circumstances reflect[s] a clear indication that trial counsel strategically chose not to object to the evidence."  *State v. D.W.N.*, 290 S.W.3d 814, 825 (Mo. App. W.D. 2009).  "Since counsel chose not to object but instead to exploit the alleged deficiencies at trial, appellant may not now be heard to complain of a chosen trial strategy."  *Id.* (internal quotation omitted).  "If it were otherwise the accused could trap the trial court with 'error' of the accused's own making or in which he joined or acquiesced."  *Id.* (internal quotation omitted).

Considering the entirety of the evidence, the trial court did not err in refusing to *sua sponte* intervene in witness examination when defense counsel deliberately chose not to object to the officer's testimony.  Rather, "the trial judge exercised appropriate evidentiary discretion and appropriate judicial restraint."  *Id.* at 826.  Under the totality of the circumstances of the case, Moreland's strategic decision not to object to the admission of the gun evidence constituted a waiver of appellate review for plain error.

Point II is denied.

14

## Conclusion

The trial court's judgment is affirmed.

_____
Mark D. Pfeiffer, Presiding Judge

Gary D. Witt and Anthony Rex Gabbert, Judges, concur.